## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF FLORIDA, INC.; LEAGUE OF WOMEN VOTERS OF FLORIDA EDUCATION FUND<br><br>Plaintiffs,<br><br>v.<br><br>ASHLEY MOODY, in her official capacity as Attorney General of Florida, CORD BYRD, in his official capacity as Florida Secretary of State,<br><br>Defendants. | Case No. ___4:23-cv-00216___ |

## COMPLAINT

Plaintiffs League of Women Voters of Florida, Inc., and League of Women Voters of Florida Education Fund (collectively "LWVFL" or "the League") bring this action against Ashley Moody, in her official capacity as Attorney General of Florida, and Cord Byrd, in his official capacity as Secretary of State of Florida ("Defendants"), and allege the following:

1

## INTRODUCTION

1.     This is a lawsuit challenging burdensome, unnecessary, and irrational restrictions on constitutionally protected voter registration speech and activity of third-party voter registration organizations ("3PVROs") in violation of the First and Fourteenth Amendment.

2.     LWVFL brings this action to prevent enforcement of Florida Senate Bill 7050's ("SB 7050") provisions related to 3PVROs, which unconstitutionally burden and chill LWVFL's and its members' core political speech and associational rights, curtailing their efforts—and the efforts of similarly situated individuals and community-based groups— to encourage civic engagement and participation in Florida's elections by assisting Florida citizens to register and exercise their fundamental right to vote.

3.     LWVFL's voter registration communications and activities are "core political speech" involving "interactive communication concerning political change." *Meyer v. Grant*, 486 U.S. 414, 422 (1988). Indeed, LWVFL's substantial endeavors to assist fellow Floridians to register to vote are themselves political and philosophical statements, signaling to community members that the League values the democratic

process and believes in the capacity of the popular will to shape the composition and direction of the government in the manner that the people decide. This poorly tailored, vague, and overbroad law cannot possibly survive the exacting scrutiny applied to such restrictions on political speech, expression, and association by the First Amendment.

4.     The right to vote is "a fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). And "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections." H. R. Rep. 103-9, §2 (1993). Such registration laws "disproportionately harm voter participation by various groups, including racial minorities." *Id.*

5.     Civic organizations, like LWVFL, have routinely expended extraordinary effort to encourage and assist individuals in registering to vote to promote broad participation in elections by all facets of society. These community-based voter registration efforts are particularly important in Florida, where, according to U.S. Census Bureau estimates, only 63.2% of the citizen voting-age population was registered to vote in

2022—placing Florida 47th among the 50 states and the District of Columbia.[1]

6.    Rather than enacting sensible regulations regarding voter registration and encouraging the registration of all eligible Florida voters, the Florida Legislature passed, and Governor Ron DeSantis signed, Senate Bill 7050, which imposes numerous burdens on 3PVROs that assist their fellow citizens in registering to vote, including certain provisions that make voter registration activity in Florida uniquely difficult among the states.

7.    *First*, SB 7050 imposes sharp restrictions on who can engage in expressive voter registration activity and, thus, who LWVFL may associate with during voter registration events. Specifically, SB 7050 bars all non-citizens and people with certain specified felony convictions from "collecting or handling voter registration applications" on behalf of a 3PVRO. As part of its registration with the Division of Elections ("Division"), a 3PVRO must affirm that no such persons will participate in "collecting or handling voter registration applications," thus requiring

---

[1] *See* Voting and Registration in the Election of November 2022—Table 4a, U.S. CENSUS BUREAU, https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-586.html (retrieved May 4, 2023).

LWVFL to question any individual it associates with about their citizenship and past conviction status, exclude individuals from its activities on this basis, and risk $50,000 fines if an excluded individual participates in its voter registration activities.

8.    *Second,* SB 7050 requires 3PVROs like LWVFL to provide a "receipt" to every voter registration applicant, including, *inter alia*, the applicant's name, the applicant's political party affiliation, the name of the 3PVRO, and the name of the individual providing assistance. The U.S. Supreme Court has already held that individual identification disclosure requirements, in the context of petition signature gathering, violate the First Amendment. *See Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999). At the same time, SB 7050 prohibits the retention of a voter applicant's "personal information." Together, these provisions place 3PVROs in a tenuous position by requiring distribution of "receipts" to voters to facilitate the filing of complaints that could result in serious penalties while restraining 3PVROs' own recordkeeping to document their compliance with SB 7050's onerous requirements.

9.     *Third,* SB 7050 also reduces the number of days 3PVROs have to deliver voter registration applications from 14 days to 10 days and heightens the already-substantial civil financial penalties levied on 3PVROs any time a voter registration application is delivered by any of its members outside that time frame or after a voter registration deadline. By imposing prohibitive penalties on 3PVROs for *any* errors or omissions by *any* of its associates in voter registration activities, SB 7050 requires 3PVROs to take on potentially ruinous financial responsibility for its volunteers' activities and thus severely hampers their expressive speech and conduct and ability to associate with a broad swath of members.

10.     *Fourth,* SB 7050 imposes onerous re-registration requirements on 3PVROs. Under Florida law, 3PVROs already must register with the Division and provide the Division with burdensome and intrusive information before conducting voter registration. Beginning on November 6, 2024, a 3PVRO's registration with the Division expires at the conclusion of the specific general election cycle for which the 3PVRO is registered, requiring it to re-register for each specific general election cycle in which it plans to conduct voter registration activities. This

requirement is especially problematic because Florida also requires the registration documents sent to the Division to include the names and addresses of each and every person who will assist people with voter registration on behalf of the 3PVRO. Further, re-registration means that every two years, the League will need to expend the time and resources necessary to assess and affirm that non-citizens and people with certain specified felony convictions do not collect or handle voter registration applications.

11.    Both on their own and in aggregate, these regulations are inordinately burdensome and will render Plaintiff LWVFL's voter registration activities far more costly, difficult and resource intensive. As a result of SB 7050, LWVFL will have to severely curtail the individuals with whom it can associate to conduct voter registration activities. And ultimately, SB 7050 will result in less voter registration activity by LWVFL and other 3PVROs. Between the civil penalties and operational limitations on voter registration activity, SB 7050 carries devastating consequences that severely limit LWVFL's ability to carry out its civic engagement mission and violate LWVFL's constitutional rights.

12.    SB 7050 transforms core civic expression and constitutionally protected voter registration activity into an extraordinarily risky enterprise for 3PVROs like LWVFL. In light of the significant restrictions imposed and civil exposure created by SB 7050, LWVFL anticipates a sharp decline in its ability to recruit members to conduct voter registration, its ability to adequately vet those members to ensure SB 7050 compliance, and its ability to convey the value of participation in the democratic process and conduct voter registration drives.

13.    SB 7050 directly restricts LWVFL's core political speech and expressive conduct in communicating its belief in the capacity of the popular will to shape the composition and direction of the government. Advocating for that belief through its endeavors to assist others in registering to vote is in itself a political and philosophical statement. Moreover, by dictating who LWVFL can involve in its voter registration activities and demanding it take on financial liability for any errors or omissions by its members, SB 7050 directly restricts LWVFL's associational rights to band together to engage in voter registration activity and to assist members of its community to join the civic community by registering to vote.

14.    Because LWVFL's voter registration efforts—a core part of its mission—will be deterred or scaled back as a result of the 3PVRO provisions, SB 7050 will result in an overall reduction in the total quantum of speech and expression related to voter registration in Florida.

15.    These onerous, overbroad, and vague requirements do not serve and cannot be justified by any compelling or legitimate state interest. The challenged provisions' only aim, and indeed, only effect, is to limit the ability of 3PVROs like LWVFL to register eligible Florida citizens to vote, and in so doing, persuade them to action by participating in the electoral process. Indeed, SB 7050 is part of a decades-long pattern of the Florida Legislature seeking to punish and deter the expressive conduct of third-party civic engagement organizations like LWVFL. The Legislature's purpose is made even clearer by the fact that it has continued to pass laws creating new obstacles for 3PVROs despite multiple court decisions declaring its previous attempts unconstitutional.

16.    Unless the challenged provisions of SB 7050 are enjoined, LWVFL's constitutionally protected political speech and activity will be chilled. LWVFL, along with many other individuals and organizations,

will be forced to communicate fewer civic and nonpartisan political messages to potential registrants and refrain from engaging in associational activity important to advancing their missions and beliefs. The public will receive less information about how to participate in the democratic process, have fewer options to register to vote, and have fewer opportunities to associate with LWVFL in meaningful civic activities.

17.    For these reasons, and those specifically alleged herein, LWVFL seeks a declaratory judgment and an injunction prohibiting Defendants from enforcing the challenged provisions of SB 7050 and permitting LWVFL's constitutionally protected community-based voter registration speech and activities to continue.

## JURISDICTION AND VENUE

18.    Because LWVFL's claims arise under the Constitution and laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

19.    Likewise, because LWVFL seeks to redress the unlawful deprivation of constitutional rights under color of state law, this Court has jurisdiction pursuant to 42 U.S.C. § 1983.

20.    This Court has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 to grant the declaratory relief Plaintiffs request.

21.    This Court has personal jurisdiction over Defendants Moody and Byrd because they are residents of Florida, and their principal places of business are in this District.

22.    Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because Defendant Moody and Byrd's offices are located in this District and a substantial portion of the events giving rise to these claims occurred in the Northern District of Florida.

## PARTIES

**Plaintiffs**

23.    The League of Women Voters of Florida, Inc. and League of Women Voters of Florida Education Fund (collectively "LWVFL" or the "League"), formed under Section 501(c)(4) and Section 501(c)(3) of the Internal Revenue Code, respectively, are nonpartisan political organizations whose mission is to facilitate informed and active participation in government by all Americans, increase understanding of major policy issues, and advocate for legislative changes and policies for

the public good. The League accomplishes this mission, in part, by encouraging eligible Florida citizens to register to vote, including by assisting them with the process, and promoting robust civic participation through voter education and assistance to facilitate their participation in the electoral process. LWVFL also regularly engages in other activities central to its mission, including community outreach, education, direct advocacy on local and statewide ballot initiatives, and legislative advocacy related to voting and elections.

24.    LWVFL is a state affiliate of the League of Women Voters of the United States. LWVFL has 29 local chapters across the state, from Pensacola to the Keys. LWVFL has thousands of members and an even greater number of supporters and volunteers, all of whom receive regular communications from the League. The League also serves and associates with non-member Floridians.

**Defendants**

25.    Defendant Ashley Moody is the 38th Attorney General of Florida and is sued in her official capacity. As Attorney General, she oversees the Department of Legal Affairs and the Office of the Statewide Prosecutor. Fla. Stat. §§ 16.015; 16.56.

26.   The Attorney General is authorized by statute to "institute a civil action for violation of" the 3PVRO provisions of SB 7050 "or to prevent a violation of" those provisions.  Fla. Stat. § 97.0575(5).

27.   Defendant Cord Byrd is the 37th Secretary of State of Florida and is sued in his official capacity. The Secretary is the head of the Florida Department of State (the "Department") and Chief Election Officer of the State.

28.   As head of the Department, the Secretary oversees the Division of Elections (the "Division") and the Office of Election Crimes and Security ("OECS"). Fla. Stat. §§ 20.10(2)(a); 97.022. As Florida's chief election officer, the Secretary is responsible for obtaining and maintaining "uniformity in the interpretation of the election laws," and providing "uniform standards for the proper and equitable interpretation and implementation" of such laws. Fla. Stat. § 97.012(1)-(2). The Secretary is also responsible for administering the statewide voter registration system. *Id*. § 97.012(11).

29.   The Secretary is responsible for referring violations of the 3PVRO provisions of SB 7050 to the Attorney General for enforcement. Fla. Stat. § 97.0575(5). The Division, which the Secretary oversees, is also

responsible for administering the registration of 3PVROs, facilitating complaints against 3PVROs, and adopting rules "to ensure that all completed [voter registration] forms are promptly delivered to the division or a supervisor in the county in which the applicant resides." Fla. Stat. § 97.0575(1), (6).

**FACTS**

**The League of Women Voters of Florida**

30.   LWVFL is a non-partisan, nonprofit, grassroots organization that runs largely on the strength of its volunteers. LWVFL relies both on dues-paying members and other, non-member volunteers to conduct almost all its activities.  In total, LWVFL has only two full-time paid staff members, three part-time staff, and one contract bookkeeper. When financially able, LWVFL also occasionally has paid interns.

31.   LWVFL currently has several thousand dues-paying members. LWVFL's annual program budget for the last fiscal year was approximately $268,425, and the League anticipates that its budget for the next few years will be similar. That amount is consistent with the LWVFL's budget in recent years.

32.   Among its activities, the League, along with its local chapters,

devotes significant time and resources to encouraging voter participation by regularly conducting voter registration drives at a variety of public locations, including local high school, college, and university campuses, libraries, grocery stores, malls, public assistance offices, naturalization ceremonies, and community events such as fairs and festivals.

33.   LWVFL has 29 local Leagues across the state of Florida, from Pensacola to the Keys. Local Leagues conduct voter registration events in both the counties in which they are based as well as in other neighboring or nearby counties where there is not a local League.

34.   In an average year, LWVFL conducts hundreds and sometimes thousands of voter registration events across the state. The League has developed a comprehensive training and certification program that League members must complete before being permitted to register voters on behalf of the LWVFL as a 3PVRO. There are currently 1,098 League members who have completed the program and are certified to serve as Registration Agents for LWVFL.

35.   When the League and its members engage in voter registration activity, they assure prospective voters with whom they engage that the League will promptly and properly deliver their

registration application to the appropriate statewide or county election officials. The League's training and certification program stresses the importance of prompt and proper delivery of such applications.

36.    During voter registration events, League members aim to assist as many prospective voters as possible to complete their voter registration applications, which they then collect and deliver to the appropriate election official. Over the course of a given year, the League typically collects and submits over 4,000 voter registration forms. The Division's records show that LWVFL is among the most effective 3PVROs in the state.

37.    During its voter registration drives, LWVFL encourages its members to participate and provide assistance. Encouraging a wide range of members to participate in voter registration activity is an important part of the League's associational activity and its organizational mission. In the League's experience, the more members present to help with a voter registration drive, the more effective the drive—particularly when the members reflect the broad demographic range of voter registration applicants that LWVFL aims to serve.

38.    Since the enactment of Amendment 4 by Florida voters in 2018, LWVFL has focused on providing education and assistance to returning citizens seeking to exercise their right to vote, including by assisting them with registering to vote. To reach eligible voters with past felony convictions where they are, the League relies on member volunteers who are part of the communities where returning citizens live and work—some of whom have past convictions themselves. Based on experience, LWVFL and its members are able to generate greater connection and trust with prospective voters when those voters can hear from people with similar backgrounds or circumstances.

39.    The League likewise provides education and assistance to newly naturalized American citizens who, by definition, have never participated in Florida elections before. To reach those newly eligible voters, the League conducts voter registration events at naturalization ceremonies and relies on members who come from communities where there are many naturalized citizens—some of whom are individuals with legal residency in Florida but who nevertheless are not U.S. citizens.

40.    The League does not have comprehensive information about the citizenship status and criminal history of all of its members. The

League does not collect citizenship and criminal history information from members. Determining not only whether its members who volunteer to conduct voter registration are all U.S. citizens but also whether they have been convicted of specific felony offenses would require the League to devote significant time, effort, and resources from other programs and efforts. Moreover, excluding individuals from League membership or its membership activities on the basis of citizenship status or criminal history is inconsistent with the League's associational values.

41.   LWVFL began as a group of suffragettes who fought very hard to win the right to vote for women in the early 20th century. The League has kept that important focus on marginalized voters over the years, while continuing to assist all voters regardless of party, economic status, or race. In particular, working directly with marginalized groups helps the League win the confidence and trust needed to successfully guide prospective voters from those communities through the voter registration process.

42.   To the extent they are able under the new laws, LWVFL and its local chapters plan to continue conducting voter registration drive activities in the future in the same manner in which they have done for

decades. However, SB 7050's restrictions will impose serious costs on LWVFL's voter registration operations and threaten to force the League to slow down, or even pause, those activities in order to re-train their members and establish new and costly compliance measures. Ultimately, the League will need to make some significant long-term changes to avoid incurring civil and criminal penalties for both the League and its members under the vague and punitive guidelines of SB 7050.

43.    When conducting voter registration drives, LWVFL occasionally retains, with the applicants' consent, certain information, including the voters' name, address, and contact information, which allows it to engage in follow-up communications with voters after they are registered to provide them with additional information about upcoming elections and encourage them to vote. These follow-up communications further the League's overall mission by expressing the League's message that voters should participate in the electoral process and continuing to associate with the voters whom its members helped to register.

44.    Collectively, the challenged provisions of SB 7050 will limit the League's ability to associate with others to conduct its voter

registration activities, limit its ability to recruit and retain volunteers to conduct its voter registration activities, curtail its ability to follow up with community members about civic participation, and reduce the League's capacity to engage in voter registration activities.

45.    The League will be required to expend and divert additional funds, staff time, and resources to its registration efforts from its other activities in order to maintain its voter registration activity while also complying with the new restrictions of SB 7050.

46.    Specifically, the League will need to completely overhaul its training and certification program for voter registration volunteers and require all members who wish to register voters to go through the program again to ensure that every one of the League's more than one thousand registration agents can comply with SB 7050's restrictions and the League can avoid harsh civil penalties.

47.    To comply with SB 7050, the League will have to intrude on members' privacy to demand information about their citizenship status and criminal history and exclude members from its voter registration activities based on that information. Such activities would be contrary to the League's associational values.

48.     The League will also be required to spend significant time and resources to re-register as a 3PVRO with the Division every two years. That will mean not only completing a time-consuming registration form, but gathering the significant amount of information required to do so. The League will need to meticulously keep track of the name and address of every one of its members who conducts voter registration assistance throughout the state and provide that information to the Division every two years and update the Division each time it learns that a new member plans to assist with voter registration. To avoid liability, it will need to demand members' criminal history and citizenship information, discussed above, before each biennial registration.

49.     And because SB 7050 imposes potentially ruinous financial liability on the League based on any errors or omissions by those participating in its voter registration activities, the League will be forced to further vet members and aggressively oversee their activities to protect itself from prohibitive fines.

50.     LWVFL expects that it will see a reduction in the number of members it is able to recruit and retain for voter registration efforts in

light of the significant criminal and civil penalties associated with SB
7050.

**Senate Bill 7050**

51.　On April 28, 2023, the Florida legislature passed Senate Bill
7050, which was signed into law by Governor Ron DeSantis on May 24,
2023.

52.　During final debate on SB 7050, Representative Tyler Sirois,
a supporter of the bill, argued that "it's not the government's role to
register citizens to vote." Yet, SB 7050 seriously curtails the rights of
*private* citizens and organizations to encourage and assist citizens to
register to vote.

53.　SB 7050 makes numerous changes to Florida's election laws,
including several provisions related to 3PVROs.

54.　Under Florida law, 3PVROs are required to register with the
Division of Elections prior to engaging in any voter registration activity.
As part of that registration, 3PVROs must provide the Division with the
organization's name and permanent address; the names of the
organization's officers; and the names, permanent addresses, and

temporary addresses (if any) of each registration agent registering persons to vote in Florida on behalf of the 3PVRO. Fla. Stat. § 97.0575(1).

55.   Under SB 7050, 3PVROs must also include the specific general election cycle for which the organization is registering people to vote and submit an entirely new registration for every general election cycle (the "Re-Registration Requirement"). Fla. Stat. §§ 97.0575(1)(d); (2) (as amended by SB 7050).

56.   The Re-Registration Requirement creates additional administrative hurdles for 3PVROs like the League, diverting its staff's time and focus by requiring it to register with the Division every two years. Biennial re-registration will be all the more burdensome because the law requires every new registration to list the names and addresses of each of the League's members who will assist others with voter registration, and because SB 7050 mandates that the League affirm that its relevant members are all citizens who have not been convicted of certain felonies.

57.   As part of their registration with the Division, SB 7050 now requires 3PVROs to affirm that "each person collecting or handling voter registration applications" has not been convicted of a felony violation of

the Election Code or a felony offense specified in Fla. Stat. § 98.0751(2)(b)-(c) or chapters 817, 831, or 837 of the Florida Code. SB 7050 subjects 3PVROs to a fine of $50,000 for every such individual who has been convicted of an enumerated felony and "is collecting or handling" voter registration applications on behalf of the 3PVRO (the "Felony Volunteer Restriction"). Fla. Stat § 97.0575(1)(e) (as amended by SB 7050).

58.  The Felony Volunteer Restriction contains no exception for individuals with felony convictions whose civil and voting rights have been restored through operation of Fla. Const. Art. VI Sec. 4(a), who have had their civil and voting rights restored by operation of the laws of another state, or for individuals who have received a pardon from the Governor of Florida, the Governor of any other state, or the President of the United States. The Felony Volunteer Restriction covers individuals with a broad swath of criminal violations, including low level felonies in the third degree, and covers individuals with those convictions regardless of when the convictions occurred.

59.  Except as to felony sexual offenses and murder, the Felony Volunteer Restriction is silent as to whether individuals convicted of

similar felony offenses under federal law or the laws of another state are subject to this provision.

60.   The offenses specified in the Felony Volunteer Restriction reach far beyond the limited felony offenses that would render a Florida resident ineligible to vote or register to vote after completion of the terms of their sentence.

61.   SB 7050 further requires 3PVROs to affirm that "each person collecting or handling voter registration applications" on behalf of the 3PVRO is a United States citizen, and subjects 3PVROs to a fine of $50,000 for every such individual who is not a U.S. citizen and "is collecting or handling" voter registration applications on behalf of the 3PVRO (the "Non-U.S. Citizen Volunteer Restriction"). Fla. Stat. § 97.0575(1)(f) (as amended by SB 7050).

62.   The Non-U.S. Citizen Volunteer Restriction prohibits all non-U.S. citizens, including legal permanent residents (i.e., green card holders) and other legal residents of the United States, from "collecting or handling" voter registration applications on behalf of 3PVROs if they are not U.S. Citizens.

63.   SB 7050 requires 3PVROs like LWVFL to provide a "receipt" to every voter registration applicant upon accepting possession of their voter registration application, in a format prescribed by the Division and including the applicant's name, the date the application was received, the name of the 3PVRO, the name of the registration agent, the applicant's political party affiliation, and the county in which the applicant resides (the "Receipt Requirement"). Fla. Stat. § 97.0575(4).

64.   The Receipt Requirement adds yet another layer of bureaucracy and red tape to the League's constitutionally protected First Amendment activity. Moreover, the Receipt Requirement's inclusion of "political party affiliation" as a required element belies an improper motive to malign organizations based on their constituents' chosen political affiliations. Finally, the Receipt Requirement's demand that volunteers identify themselves when engaging in voter registration activity directly regulates their speech and discourages volunteer participation without sufficient cause.

65.   SB 7050 prohibits a person collecting voter registration applications on behalf of a 3PVRO from copying the voter's application or "retain[ing] a voter's personal information, such as the voter's Florida

driver license number, Florida identification card number, social security number, or signature, for any reason other than to provide such application or information to the [3PVRO] in compliance" with Section 97.0575 of the Florida Statutes (the "Voter Information Restriction"). Fla. Stat. § 97.0575(7) (as amended by SB 7050). Violation of this provision is a third-degree felony. *Id*.

66.    SB 7050 gives a handful of examples but does not fully define what "personal information" 3PVROs and their agents are prohibited from keeping. For example, it is unclear whether a voter's home address, phone number, or email address fall within this provision.

67.    Although 3PVROs like the League are required to provide a receipt to voter registration applicants under SB 7050, the Voter Information Restriction may subject the League, its staff, and its members to civil and criminal penalties if they keep a copy of that receipt.

68.    Moreover, SB 7050 subjects the League, its staff, and its members to civil and criminal penalties if they retain the voter's "personal information," even as part of their recordkeeping to defend against any complaints of noncompliance with SB 7050.

69.   SB 7050 also subjects the League, its staff, and its members to civil and criminal penalties if they retain the voter's "personal information," event with their consent, for follow-up communications and further assistance with the voting process.

70.   Under SB 7050, 3PVROs must "promptly deliver[]" any voter registration application collected from an applicant to the Division  or appropriate County Supervisor of Elections "within 10 days after the application is completed by the applicant, but not after registration closes for the next ensuing election." Fla. Stat. § 97.0575(5)(a) (as amended by SB 7050). This reduces the time limit for delivery from 14 days after the completion of the application to 10 days. Any deviation from this requirement from any staff member or volunteer for a 3PVRO can result in steep, and potentially financially ruinous, penalties for the 3PVRO, as described below (collectively, the "Delivery Penalties").

71.   If any staff member or volunteer for a 3PVRO fails to deliver a voter registration application to the appropriate election official within 10 days after the application is completed, the 3PVRO is liable for a fine of $50 per each day late, up to $2,500, for each application received more than 10 days after it is completed, or a fine of $2,500 may be imposed if

the 3PVRO or its representative acted willfully. Fla. Stat. § 97.0575(5)(a)(1) (as amended by SB 7050).

72.    If any staff member or volunteer for a 3PVRO delivers a voter registration application after the close of registration for the next ensuing election after the application is completed, the 3PVRO is subject to a fine of $100 per each day past the registration deadline, up to $5,000, for each application received after the close of registration, or a fine of $5,000 if the 3PVRO or its representative acted willfully. Fla. Stat. § 97.0575(5)(a)(2) (as amended by SB 7050).

73.    If any staff member or volunteer for a 3PVRO collects an application and does not submit it to the Division or appropriate County Supervisor of Elections, the 3PVRO is subject to a fine of $500 for each application, or a fine of $5,000 if the 3PVRO or its representative acted willfully. Fla. Stat. § 97.0575(5)(a)(3) (as amended by SB 7050).

74.    The highest aggregate fine that may be assessed against a 3PVRO and its affiliates for late-submitted applications in a calendar year is $250,000. Fla. Stat. § 97.0575(5)(a)(3) (as amended by SB 7050). That sum is nearly the entirety of LWVFL's average annual budget.

75.   SB 7050's provisions are retroactively effective for any 3PVRO registered with the Department of State as of July 1, 2023. Fla. Stat. § 97.0575(12) (as amended by SB 7050).

76.   LWVFL and local Leagues usually conduct thousands of voter registration events across the state of Florida, including in counties without local Leagues present. In order to comply with the 10-day delivery requirement under SB 7050, League members will have to drive many miles to County Supervisor of Elections Offices in counties where they do not live, or else rely on the U.S. Postal Service to deliver completed applications to the relevant County Supervisor or the Division before the deadline.

77.   The League also conducts voter registration events at large events with attendees from across the state. At these events, League members assist voters from many different counties to complete voter registration applications; returning those applications to the Division or the relevant County Supervisors within the 10-day timeline will require the League to expend additional resources and time to ensure that postal delays and travel time do not result in inadvertently tardy applications and corresponding fines. This will limit the League's ability to conduct

30

voter registration activity on the scale at which it has historically done so.

78.   LWVFL members have already expressed concern and fear about the significant criminal and civil penalties associated with voter registration in SB 7050, and the League expects that the number of voter registration volunteers it will have for future election cycles will continue to decline significantly with this law in force.

## CLAIMS

### Count 1: Violation of Plaintiffs' First Amendment Rights to Free Speech and Expressive Conduct
### U.S. Const., amends. I, XIV; 42 U.S.C. § 1983

79.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-78 as if fully set forth herein.

80.   The First Amendment to the United States Constitution prohibits abridgment of freedom of speech and freedom of expression.

81.   The First Amendment is applied to the states through the Fourteenth Amendment. In the following paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

82.    Like the circulation of an initiative petition for signatures, voter registration activity is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 421-22 (1988). Whether a voter should register and ultimately participate in an election is a "matter of societal concern that [Plaintiffs] have a right to discuss publicly without risking criminal sanctions." *Id.* at 421; *see also Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 186-87 (1999) (quoting *Meyer*, 486 U.S. at 422).

83.    Together and individually, the Felony Volunteer Restriction, the Non-U.S. Citizen Volunteer Restriction, the Receipt Requirement, the Voter Information Restriction, the Delivery Penalties, and the Re-Registration Requirement (together the "challenged provisions") curtail LWVFL's core political speech, which includes its interactive communications and activities aimed at encouraging eligible Floridians to register to vote and participate in the democratic process. LWVFL takes a position and expresses a point of view in the ongoing debate on whether to engage or disengage from the political process and urges eligible citizens to participate by registering to vote.

84.   LWVFL's activities express its organizational belief in the capacity and authority of the popular will to shape the composition and direction of the government in our democratic system. The League advocates for that belief by seeking to persuade Floridians to participate in democracy by providing the education and assistance for eligible citizens to register to vote, convincing them that voter registration is a safe and worthwhile endeavor, and assisting them to complete and return their voter registration applications. The challenged provisions of SB 7050 inhibit the League's core political speech and expressive conduct that are at the heart of First Amendment protections.

85.   SB 7050's challenged provisions obstruct LWVFL's core political speech by "reducing the total quantum of speech on a public issue" because the law wholly bans two classes of speakers—non-U.S. citizens and persons with certain felony convictions—and by hindering LWVFL's right "to select what they believe to be the most effective means for" expressing core political speech, *see Meyer*, 486 U.S. at 423-24. Collectively, these restrictions "reduce[] the voices available to convey political messages," *Buckley*, 525 U.S. at 210 (Thomas, J., concurring), because they either preclude or substantially impair LWVFL's ability to

engage with potential voters and to encourage political participation through voter registration.

86.   The challenged provisions of SB 7050 disfavor LWVFL's speech based on its content, the identity of the speaker, and the viewpoint the League and its members express.

87.   The challenged provisions of SB 7050 are unconstitutional content- and viewpoint-based restrictions on speech because they define the coverage of their restrictions and prohibitions based on the subject of the League's speech. SB 7050's challenged provisions target 3PVROs' communications about voter registration, and in fact only limit speech that aims to *promote* voter registration. Similar speech by the League or other similar organizations *discouraging* voter registration would be entirely unaffected by SB 7050's provisions.

88.   The prohibition on and threat of civil penalties for using volunteers with felony convictions or who are non-U.S. citizens to collect and deliver voter registration applications is a severe burden on LWVFL's First Amendment rights based on the identity of the speaker. These provisions prevent LWVFL from recruiting volunteers from communities it aims to serve through its civic engagement activity and

limit the scope of its expressive conduct, unconstitutionally favoring the speech of some speakers and barring the exact same speech from others.

89.    SB 7050's Receipt Requirement imposes a severe bureaucratic burden on LWVFL's constitutionally protected voter registration activities without sufficient support. Moreover, the Receipt Requirement's demand that volunteers identify themselves on receipts "discourages participation in [voter registration drives] by forcing name identification without sufficient cause." *Buckley*, 525 U.S. at 200.

90.    SB 7050's limitation on LWVFL's use of voter information prohibits it from engaging in follow up communications with voters whom it has assisted to register and prevents it from providing voters with information about future elections and encouraging them to participate in the electoral process. Moreover, this restriction on organizational recordkeeping, combined with the numerous penalties for noncompliance in SB 7050, hamstrings 3PVROs' ability to defend themselves from potentially ruinous liability and thus severely burdens voter registration activity. This provision is a severe burden on LWVFL's First Amendment rights.

91.    SB 7050's Re-Registration Requirement adds yet another task to the considerable list of administrative responsibilities imposed by the state. By requiring that the League file registration papers with the Division every two years, SB 7050 makes the League's voter registration efforts more difficult and diverts the League's time and resources without legitimate reason. The burden created by the Re-Registration Requirement is even higher because each biennial registration must include the names and addresses of each of the League's members who will assist others with voter registration and affirm that its relevant members are all citizens who have not been convicted of certain felonies.

92.    Punitive civil and criminal sanctions associated with political expression, like the Delivery Penalties and other sanctions attached to the challenged provisions, inhibit the exercise of First Amendment freedoms.

93.    Because of the chilling effect of the risk of punitive criminal civil sanctions and the restrictions on how the League can communicate about and conduct its expressive voter registration activity, SB 7050 unconstitutionally infringes upon LWVFL's First Amendment rights. By chilling voter registration activities, SB 7050 will "reduce[] the voices

available to convey political messages." *Buckley*, 525 U.S. at 210 (Thomas, J., concurring). Restrictions on voter registration activity will reduce the total voices available to speak in favor of political participation and voter registration and therefore run afoul of the First Amendment.

94.  These requirements are not narrowly tailored to serve any compelling state interest. Indeed, these requirements do not actually advance any legitimate regulatory interest and serve little purpose other than to dissuade civic organizations like LWVFL from engaging in voter registration activity. The Legislature's interest in punishing LWVFL and its peers for its voter registration activities is made plain by its repeated attempts to hamstring and impose increasingly punitive sanctions on their activities despite repeated court rulings that such restrictions run afoul of the First and Fourteenth Amendments.

95.  Under the exacting scrutiny applied in *Meyer* and *Buckley*, or any other level of judicial scrutiny, these requirements fail.

### Count 2: Violation of Plaintiffs' First Amendment Right to Free Association
### U.S. Const., amends. I, XIV; 42 U.S.C. § 1983

96.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-95 as if fully set forth herein.

97.    The First Amendment prohibits government abridgment of the freedom of association. *See NAACP v. Button*, 371 U.S. 415, 430 (1963).

98.    The challenged provisions of SB 7050 directly and severely burden LWVFL's associational rights by (1) preventing the League from freely banding together with others through one of its central associational activities: voter registration drives; and (2) hamstringing the League's attempts to associate with Florida citizens by encouraging them to register to vote and participate in the political process.

99.    These restrictions prevent the League from broadening the base of public participation in and support for its activities promoting democratic engagement through voter registration. The challenged provisions of SB 7050 will reduce the options and opportunities for the League to associate with potential voters and volunteers and jointly participate in First Amendment-protected activities with the League and other civic engagement organizations.

100.   First, the Felony Volunteer Restriction and the Non-U.S. Citizen Volunteer Restriction entirely prohibit LWVFL from associating with certain classes of Floridians to participate in expressive voter

registration activity. These Volunteer Restrictions will require the LWVFL to probe its members' and supporters' citizenship status and criminal history and exclude individuals from its associational activities based on such information. The Volunteer Restrictions are direct and unlawful restrictions on the people with whom the League can associate.

101. Second, the challenged provisions impose potentially devastating financial liability on the League and other 3PVROs based on inadvertent errors and omissions by any staff member or volunteers that participate in their voter registration activities. By imposing strict liability on 3PVROs for the actions of their associates, SB 7050 severely burdens their ability to broaden their associational reach. Rather than expanding their associational relationships, SB 7050 forces the League and other 3PVROs to impose harsh vetting procedures on its associates to protect itself from liability.

102. Third, the challenged provisions, individually and collectively, make engagement with the League's voter registration activities risky and burdensome and therefore dissuade participation in the League's activities. The League has already received reports from

members and supporters concerned about continued participation in its events given SB 7050's restrictions.

103. Fourth, the overbroad limitations on voter registration activity and burdensome monetary and criminal sanctions for violations also inhibit the League from recruiting, consulting, and otherwise associating with other Florida-based organizations and volunteers that register voters for fear of incurring crippling penalties.

104. Fifth, as described herein, SB 7050's restrictions will curtail the breadth and reach of the League's voter registration activities. Through its voter registration activities, the League not only fortifies its relationships with its members and supporters, but also forms new relationships with potential Florida voters that it seeks to bring into the Florida political community. SB 7050 will undeniably reduce the number of such connections the League can make. The Voter Information Restriction specifically bars the League from retaining personal voter information, even with consent, in order to further those connections after the first step of voter registration. And the Re-Registration Requirement, by sharply increasing the League's administrative

responsibilities, will necessarily reduce the time and resources its staff and members can devote to voter registration activities.

105.  The challenged provisions impose a severe burden on LWVFL's freedom of association and are subject to strict scrutiny.

106.  The challenged provisions are not narrowly tailored to serve any compelling state interest. They restrict LWVFL and all similarly situated organizations from engaging with voters and associating with volunteers for the purpose of voter registration in their preferred and most effective manner.

107.  These requirements cannot satisfy even a more lenient standard of review because they do not actually advance and are not rationally related to any legitimate regulatory interest. They do nothing more than hinder civic organizations from associating with voters and volunteers concerning voter registration activity and other future engagement in the political process.

108.  Under the scrutiny standard applied in *Meyer* and *Buckley*— indeed, under any level of judicial scrutiny—the challenged provisions of SB 7050 violate LWVFL's First Amendment guarantee of freedom of association.

## Count 3: Substantial Overbreadth
## U.S. Const., amends. I, XIV; 42 U.S.C. § 1983

109.  LWVFL repeats and realleges each and every allegation contained in paragraphs 1-108 as if fully set forth herein.

110.  The First Amendment prohibits government abridgment of the freedom of speech through the enactment of substantially overbroad laws. *See Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 577 (1987).

111.  The challenged provisions of SB 7050 are unconstitutionally overbroad, as they needlessly regulate a substantial amount of constitutionally protected expression and associations.

112.  SB 7050's threat of civil and criminal penalties for violations will impermissibly chill LWVFL's protected speech, including the League and its members' efforts to promote civic participation and educate voters about, and assist them with, the process for registering to vote.

113.  The Felony Volunteer Restriction and Non-U.S. Citizen Volunteer Restriction are overbroad because they prohibit entire classes of people from engaging in political expression by participating in voter registration efforts with the League.

114. The penalties for retaining voter information are also unconstitutionally overbroad. The substantial overbreadth of the provision would sweep in a range of protected First Amendment activity, including by applying regardless of whether the voter consents to the League's retention of their contact information for continued political communications and association.

115. Criminal prosecution contemplated by statutes that govern expression, such as those contained in and amended by SB 7050, inhibits the full exercise of First Amendment freedoms.

116. The challenged provisions of SB 7050 contain steep criminal and civil sanctions for even a single inadvertent violation. Such penalties are undoubtedly chilling on protected expression and core political speech and risk capricious enforcement, and therefore do not survive First Amendment scrutiny.

## Count 4: Void for Vagueness
### U.S. Const., amend. XIV; 42 U.S.C. § 1983

117. LWVFL repeats and realleges each and every allegation contained in paragraphs 1-116 as if fully set forth herein.

118.   The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires that laws that impose penalties give ordinary people reasonable notice of what conduct they prohibit and guard against arbitrary and discriminatory enforcement.

119.   The applicability of the void for vagueness doctrine is heightened both when criminal sanctions are attached to a vague law and whenever the First Amendment is implicated. Here, SB 7050 does both.

120.   SB 7050 requires 3PVROs to provide voter registration applicants whom they assist with a "receipt" containing the applicant's name, the date the application is received, the name of the 3PVRO, the name of the registration agent, the applicant's political party affiliation, and the county in which the applicant resides. Fla. Stat. § 97.0575(4) (as amended by SB 7050).

121.   SB 7050 further prohibits "a person collecting voter registration applications on behalf of a [3PVRO]" from "cop[ying] a voter's application or retain[ing] a voter's personal information, such as the voter's Florida driver license number, Florida identification card number, social security number, or signature, for any reason other than to provide

44

such application or information to the [3PVRO] in compliance with [Section 97.0575]." Violation of this prohibition is a third degree felony.

122. SB 7050 does not define "personal information," nor does it elaborate on what uses of personal information by 3PVROs would be "in compliance" with this statute. Neither does SB 7050 allow for retention or use of applicants' personal information by 3PVROs with an applicant's consent.

123. The Felony Volunteer Restriction prevents LWVFL and similar organizations from employing volunteers who have been convicted of "a felony violation of the Election Code, a felony violation of an offense specified in [Section] 825.103, a felony offense specified in [Section] 98.0751(2)(b) or (c), or a felony offense specified in chapter 817, chapter 831, or chapter 837" of the Florida Statutes. Fla. Stat. § 97.0575(1)(e) (as amended by SB 7050).

124. The Felony Volunteer Restriction contains no exceptions for individuals who have been convicted of the felony offenses specified in the statute but who have had their civil and voting rights restored by Amendment 4 or who have received a pardon from the Governor.

125.  It is not clear from the text of SB 7050 whether or how the Felony Volunteer Restriction applies to voter registration volunteers who have been convicted of comparable felonies in federal court or other states.

126. The Felony Volunteer Restriction and Non-U.S. Citizen Volunteer Restriction apply only to individuals who "collect[] or handl[e]" voter registration applications for 3PVROs. The statute does not define what it means to "handl[e]" voter registration applications, and it is unclear whether an individual who assists with quality control for voter registration applications, helps transport collected voter registration applications, or even just receives and distributes voter registration applications falls within the definition of "handling voter registration applications." Further, the law does not clarify the difference between persons who "collect[] or handl[e]" applications and those who qualify as "registration agents," and therefore must be listed by name and address on all 3PVROs' biennial registration documents. Fla. Stat. § 97.0575(1)(c), (e), (f) (as amended by SB 7050).

127.  Due to these vague provisions, SB 7050 fails to give 3PVROs fair notice of who must comply with its requirements and under what circumstances, or whether and how to comply with those provisions.

128.  Individuals who violate the Voter Information restriction of SB 7050 are subject to criminal penalties.

129.  Violations of SB 7050 are subject to significant civil penalties. It is unclear whether the penalties for willful activity are in addition to, or replacements for, the standard penalties for late-delivered forms, nor is it clear whether the penalties for willful activity are subject to the same maximum amounts as the standard penalties for late-delivered forms.

130.  As a result of this ambiguity, SB 7050 also fails to provide 3PVROs with reasonable notice of the extent of potential penalties and provides no guard against arbitrary enforcement of the law.

131.  The vagueness of these provisions heightens the likelihood of arbitrary or discriminatory enforcement since the provisions could be variously read to reach certain conduct or not.

132.  Because of the burdens that SB 7050 will put on LWVFL's voter registration activities, the League will have to expend additional resources to conduct voter registration. But for the burdens imposed by

SB 7050, these resources could be spent on the League's other activities and priorities. Even with additional diverted resources, LWVFL believes its voter registration efforts will be less effective because of the burdens SB 7050 will impose.

## PRAYER FOR RELIEF

WHEREFORE, LWVFL respectfully requests that the Court enter judgment in its favor and:

A. Declare that the challenged provisions within Fla. Stat. § 97.0575, as amended by SB 7050, violate the First and Fourteenth Amendments;

B. Preliminarily and permanently enjoin Defendants from enforcing the challenged provisions within Fla. Stat. § 97.0575, as amended by SB 7050, particularly the civil financial penalties contained therein;

C. Retain jurisdiction to render any and all further orders that this court may deem necessary;

D. Award LWVFL its attorneys' costs and fees pursuant to statute; and

E. Grant any and all other relief this Court deems just and proper.

48

Dated: May 24, 2023                 Respectfully submitted,

/s/ Chad Dunn                       **CAMPAIGN LEGAL CENTER**
Chad W. Dunn                        Danielle Lang (D.C. Bar No. 1500218)*
Florida Bar No. 0119137            Jonathan Diaz (D.C. Bar No. 1613558)*
1200 Brickell Avenue, Suite        Brent Ferguson (D.C. Bar No. 1782289)*
1950                               Ellen Boettcher (D.C. Bar No. 90005525)*
Miami, FL 33131                    Simone Leeper (D.C. Bar No. 1737977)*
Telephone: (305) 783-2190          1101 14th Street NW, Ste. 400
Facsimile: (305) 783-2268          Washington, DC 20005
chad@brazilanddunn.com             (202) 736-2200
                                   dlang@campaignlegalcenter.org
                                   jdiaz@campaignlegalcenter.org
                                   bferguson@campaignlegalcenter.org
                                   eboettcher@campaignlegalcenter.org
                                   sleeper@campaignlegalcenter.org

*Counsel for Plaintiffs*            **pro hac vice* motion forthcoming