**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

LEAGUE OF WOMEN VOTERS
OF FLORIDA, INC.; LEAGUE
OF WOMEN VOTERS OF
FLORIDA EDUCATION FUND

           Plaintiffs,

              v.

ASHLEY MOODY, in her official
capacity as Attorney General of
Florida, CORD BYRD, in his
official capacity as Florida
Secretary of State,

           Defendants.

Case No. 4:23-cv-00216

Chief Judge Mark E. Walker

**PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY
INJUNCTION**

Pursuant to Federal Rule of Civil Procedure 65(a), Plaintiffs the

League of Women Voters of Florida, Inc., and the League of Women

Voters of Florida Education Fund respectfully move the Court for a

preliminary injunction against the enforcement of SB 7050 by

Defendants Ashley Moody, in her official capacity as Attorney General, and Cord Byrd, in his official capacity as Secretary of State.

The provisions of SB7050 that pertain to third-party voter registration organizations enact discriminatory restrictions on these organizations' First Amendment rights to core political speech and association. As more fully set forth in Plaintiffs' memorandum in support of this motion, Plaintiffs are likely to succeed on the merits of their claims and will suffer irreparable harm from the enforcement of SB7050 in the absence of preliminary relief. The balance of equities tilts strongly in Plaintiffs' favor, and an injunction protecting their constitutional rights is in accord with the public interest. Because the Law and its attendant harms will take effect on July 1, 2023, absent relief from this Court, Plaintiffs' need for relief is urgent.

Therefore, a preliminary injunction should issue.

## MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................iii

INTRODUCTION...........................................................................1

BACKGROUND ..............................................................................4

  I. The League of Women Voters of Florida........................................4

  II. Senate Bill 7050 .....................................................................5

    A. Felony Volunteer Restriction.................................................6

    B. Non-U.S. Citizen Volunteer Restriction ...................................6

    C. Receipt Requirement.........................................................7

    D. Voter Information Restriction ..............................................7

  III. Impacts of the Law ................................................................8

    A. Volunteer Restrictions.......................................................9

    B. Receipt Requirement .......................................................11

    C. Voter Information Restriction ............................................12

    D. Risk Minimization ..........................................................13

LEGAL STANDARD .......................................................................15

ARGUMENT .................................................................................15

  I. Plaintiffs have standing ..........................................................15

    A. The League has organizational standing................................16

    B. The League has associational standing .................................19

  II. Plaintiffs are substantially likely to succeed on the merits of their claims..............................................................................21

    A. The League is likely to succeed on its First Amendment claims ...........................................................................22

      1. The court must apply strict or exacting scrutiny.................22

        a. Free speech and expressive conduct ..............................22

        b. Free association.......................................................25

      2. The challenged laws cannot survive strict or exacting scrutiny ...............................................................................27

        a. The Volunteer Restrictions ............................................28

b.  The Voter Information Restriction ................................... 34

c.  The Receipt Requirement ................................................ 37

B. The League is likely to succeed on its overbreadth claims ....... 38

C. The League is likely to succeed on its vagueness claims .......... 41

III. Plaintiffs will suffer irreparable harm absent relief .................. 45

A.  The Volunteer Restrictions will cause irreparable harm ........ 46

B.  The Voter Information Restriction and Receipt Requirement will cause irreparable harm ..................................................... 48

IV. The balance of equities weighs in Plaintiff's favor, and a preliminary injunction is not adverse to the public interest ........ 50

CONCLUSION ................................................................................ 52

LOCAL RULE 7.1(C) CERTIFICATE OF CONFERRAL ..................... 53

LOCAL RULE 7.1(F) CERTIFICATE .................................................... 53

# TABLE OF AUTHORITIES

## Cases

*American-Arab Anti-Discrimination Committee v. City of Dearborn*, 418 F.3d 600 (6th Cir. 2005) ..................................... 31, 32

*Arcia v. Florida Secretary of State*, 772 F.3d 1335 (11th Cir. 2014) ............................................................... 19, 20

*Bernal v. Fainter*, 467 U.S. 216 (1984) .................................... 29

*Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) .............................. 26

*Buckley v. American Constitutional Law Foundation*, 525 U.S. 182 (1999) ............................................. 21, 27, 38

*City Walk - Urban Mission Inc. v. Wakulla County Florida*, 471 F. Supp. 3d 1268 (N.D. Fla. 2020) ................................ 45

*Curling v. Raffensperger*, 50 F.4th 1114 (11th Cir. 2022) ............... 27, 28

*Dream Defenders v. DeSantis*, 559 F. Supp. 3d 1238 (N.D. Fla. 2021) .............................................................. 45

*Dream Defenders v. Governor of the State of Florida*, 57 F.4th 879 (11th Cir. 2023) ........................................ 16, 40, 41, 42

*Dunn v. Blumstein*, 405 U.S. 330 (1972) ................................... 33

*Estrada v. Becker*, 917 F.3d 1298 (11th Cir. 2019) .......................... 30, 39

*Florida Democratic Party v. Scott*, 215 F. Supp. 3d 1250 (N.D. Fla. 2016) .......................................................... 46, 48

*Florida State Conference of The National Association For The Advancement Of Colored People v. Browning*, 522 F.3d 1153 (11th Cir. 2008) ................................................. 17, 18, 26

*In re Griffiths*, 413 U.S. 717 (1973) ...................................... 29, 30

*Haitian Refugee Center, Inc. v. Baker*, 789 F. Supp. 1552 (S.D. Fla. 1991) ........................................................... 27

*Hand v. DeSantis*, 946 F.3d 1272 (11th Cir. 2020) ............................... 32

*Hand v. Scott*, 285 F. Supp. 3d 1289 (N.D. Fla. 2018) .......................... 32

*Jacobson v. Florida Secretary of State*, 974 F.3d 1236 (11th Cir. 2020) ........................................................... 15, 16

*Johnson v. City of Cincinnati*, 310 F.3d 484 (6th Cir. 2002) ........... 32, 33

*KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261
(11th Cir. 2006) .................................................................................... 51

*Kusper v. Pontikes*, 414 U.S. 51 (1973) ............................................. 25, 26

*League of Women Voters v. Hargett*, 400 F. Supp. 3d 706
(M.D. Tenn. 2019) .................................................... 22, 23, 24, 35, 36

*League of Women Voters of Florida v. Browning,*
863 F. Supp. 2d 1155 (N.D. Fla. 2012) ......................................... 22, 51

*League of Women Voters of Florida v. Cobb,*
447 F. Supp. 2d 1314 (S.D. Fla. 2006) ............................. 22, 23, 24, 52

*League of Women Voters of Florida, Inc., v. Detzner,*
314 F. Supp. 3d 1205 (N.D. Fla. 2018) .................................. 45, 46, 47

*League of Women Voters of Florida v. Florida Secretary of State,*
66 F.4th 905 (11th Cir. 2023) ............................................................ 41

*McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995) .. 21, 27, 38

*Meyer v. Grant*, 486 U.S. 414 (1988) ............................... 21, 23, 24, 27, 31

*National Association for the Advancement of Colored People v.
Button*, 371 U.S. 415 (1963) ............................................................... 26

*Otto v. City of Boca Raton, Florida*, 981 F.3d 854
(11th Cir. 2020) ..................................................................... 15, 50, 51

*Packingham v. North Carolina*, 582 U.S. 98 (2017) .............................. 32

*Petersen v. Talisman Sugar Corporation*, 478 F.2d 73
(5th Cir. 1973) ..................................................................................... 27

*Pittman v. Cole*, 267 F.3d 1269 (11th Cir. 2001) .................................... 15

*Priorities USA v. Nessel*, 462 F. Supp. 3d 792 (E.D. Mich. 2020) .... 23, 42

*Reed v. Town of Gilbert, Arizona*, 576 U.S. 155 (2015) ................... 25, 27

*Speech First, Inc. v. Cartwright*, 32 F.4th 1110
(11th Cir. 2022) ................................................ 16, 24, 25, 38, 39, 41

*United States v. Kelly*, 625 F.3d 516 (8th Cir. 2010) ............................. 40

*Vital Pharmaceuticals, Inc. v. Alfieri*, 23 F.4th 1282
(11th Cir. 2022) .................................................................................... 51

iv

*VoteAmerica v. Schwab*, No. CV 21-2253-KHV, 2023 WL
    3251009 (D. Kan. May 4, 2023) ........................................................ 21


**Statutes, Bills, and Other Constitutional Provisions**

52 U.S.C. 20507(i) ........................................................................ 36

Fla. Stat. § 97.012(1)-(2) .......................................................... 21

Fla. Stat. § 97.0575(1)(e) ........................................ 6, 28, 41, 42

Fla. Stat. § 97.0575(1)(f) .................................... 6, 7, 28, 41, 42

Fla. Stat. § 97.0575(4) .......................................... 7, 37, 42, 44

Fla. Stat. § 97.0575(7) .................................... 7, 8, 35, 40, 42

Fla. Stat. § 97.0575(8) .......................................................... 21

Fla. Stat. § 97.0575(12) .......................................................... 5

Fla. Stat. § 98.0751(2)(b)-(c) .................................................. 6

Fla. Stat. § 104.011(2) ............................................................ 31

Fla. Stat. § 817 ........................................................................ 6

Fla. Stat. § 817.234 ................................................................ 43

Fla. Stat. § 817.26 .................................................................. 33

Fla. Stat. § 817.5621 .............................................................. 33

Fla. Stat. § 817.568 ................................................................ 31

Fla. Stat. § 817.802(1) ............................................................ 33

Fla. Stat. § 825.103(1)(c) ........................................................ 33

Fla. Stat. § 831 ........................................................................ 6

Fla. Stat. § 837 ........................................................................ 6

Georgia Code § 33-1-9 ............................................................ 43

*Senate Bill 7050*, THE FLORIDA SENATE,
https://www.flsenate.gov/Session/Bill/2023/7050 (last visited
June 3, 2020). .......................................................................... 5

**Other**

Joshua A. Douglas, *A History of Third-Party Voter Registration Drives*, May 17, 2023, Institute for Responsive Government, https://responsivegoverning.org/research/a-history-of-third-party-voter-registration-drives/ ....................................................... 4, 5

Fla. Senate Floor Debate on SB 7050, at 48:45-49:02 (Apr. 26, 2023), *available at* https://www.flsenate.gov/media/Video Player?EventID=1_nty0d3lq-202304261000. ................................... 28

*Handle*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/handle#dictionary-entry-2 (last visited Jun. 7, 2023). ....................................................................... 42

# INTRODUCTION

Plaintiffs seek to preliminarily enjoin four newly enacted provisions of Florida law that will severely burden their voter registration efforts in violation of the First Amendment.

The League of Women Voters of Florida, through its members, has long pursued one core mission: empowering voters and expanding access to democracy. A key component of that mission is guiding Floridians through the voter registration process. That work takes place all over Florida at parades, county fairs, naturalization ceremonies, events for citizens returning from incarceration, and many other places. And it has been successful — the League registers tens of thousands of voters every year, and according to the Secretary of State's own records, it is one of the most effective voter registration organizations in the state.

SB 7050 is tailor-made to undermine the League's successful voter engagement. First, it prohibits League-affiliated volunteers from "collecting or handling" voter registration applications if they are non-citizens or have been convicted of certain felonies. And though the scope of that ban is vague, the League must pay a $50,000 fine each time a

prohibited person collects or handles an application, regardless of whether the League has diligently tried to follow the law.

Second, SB 7050 creates onerous and contradictory requirements that will make every interaction between League volunteers and prospective voters more difficult. It requires volunteers to provide a detailed receipt to each registration applicant, and that receipt must include the volunteer's own name as well as information about the applicant. To ensure compliance with that requirement, the League would normally plan to keep a copy of each receipt it distributes. But a separate provision of SB 7050 makes it a third-degree felony to retain any of the applicant's "personal information."

These provisions are unconstitutional. They restrict the League's speech about voter registration and limit who the League can associate with in its effort to register voters. They create unnecessary administrative hurdles and will deter League members and volunteers from registering voters for fear of felony prosecution and incurring steep fines that will bankrupt the organization. In fact, League members have already registered their fear and potential unwillingness to keep performing voter registration services. To avoid those risks, if the

challenged laws are not enjoined, the League will at least temporarily cease its longstanding practice of assisting people with paper voter registration forms and delivering completed forms to state and county election officials. Instead, it will help voters register online or simply provide blank registration forms.

None of the challenged provisions reflect a genuine effort to preserve election integrity, protect Floridians' personal information, or serve any other legitimate state goal. Their broad sweep and confusing language make plain that they are simply intended to make voter engagement more difficult.

A preliminary injunction is necessary to protect Plaintiffs' First Amendment rights. The relevant provisions of SB 7050 take effect in a matter of weeks, and the League is already devoting time and resources to planning the extraordinary changes to its operations that the law will necessitate. If SB 7050 is not enjoined, those burdens will be multiplied, and the League will immediately lose innumerable chances to register voters.

## BACKGROUND

## I.    The League of Women Voters of Florida

The League of Women Voters of Florida, Inc. and the League of Women Voters of Florida Education Fund (collectively "the League") are affiliated nonpartisan, nonprofit organizations whose mission is to facilitate informed and active participation in government by all Americans, increase understanding of major policy issues, and advocate for legislative changes and policies for the public good. *See* Declaration of Cecile Scoon ("Scoon Decl.") ¶3. With its 29 local chapters and thousands of dues paying members, the League encourages eligible Florida citizens to register to vote, including by assisting them with the process, and promoting robust civic participation through voter education and assistance to facilitate their participation in the electoral process. *See* Scoon Decl. ¶¶4-8. A primary focus for the League is voter registration, especially for communities of color and returning citizen populations. *See id.* ¶¶8, 10, 12-18. Floridians in particular rely on civic organizations to help them register to vote, and the League has long played a foundational role in that effort.[1]

---

[1] *See* Joshua A. Douglas, *A History of Third-Party Voter Registration Drives*, May 17, 2023, Institute for Responsive Government, https://responsivegoverning.org/research/a-history-of-third-party-voter-

The League also engages in other activities including outreach, education, and advocacy on legislation and ballot initiatives. *See id.* ¶5. The League has two full-time and three part-time paid staff members and one contract bookkeeper. *See id.* ¶8. Its annual program budget last year was approximately $268,425, and it anticipates the budget for upcoming years to be similar. *See id.* ¶9.

The League conducts hundreds and sometimes thousands of voter registration events per year across the state, registering tens of thousands of eligible Floridians each year, making it one of the most effective 3PVROs in Florida. *See id.* ¶¶13-16.

## II.  Senate Bill 7050

On April 28, 2023, the Florida legislature passed Senate Bill 7050 ("SB 7050" or "the Law"), which was signed by Governor Ron DeSantis on May 24, 2023.[2] SB 7050's provisions are retroactively effective for any third-party voter registration organization ("3PVRO") registered with the Department of State as of July 1, 2023. Fla. Stat. § 97.0575(12).[3]

---

registration-drives/ (noting that in one Florida county, civic organizations registered 63 percent of all new voters before 2004 elections and explaining that "[t]he most intensive efforts for voter registration in the wake of the Nineteenth Amendment came from" the national League of Women Voters).

[2] *Senate Bill 7050*, THE FLORIDA SENATE, https://www.flsenate.gov/Session/Bill/2023/7050 (last visited June 3, 2020).

[3] All citations to Fla. Stat. § 97.0575 are to the version amended by SB 7050.

The Law contains several provisions that restrict 3PVROs. Four of those provisions (the "challenged laws") are the focus of this motion.

A. <u>Felony Volunteer Restriction</u>

SB 7050 includes two provisions banning certain people from assisting 3PVROs with voter registration (the "Volunteer Restrictions"). First, the Law prevents 3PVROs from working with volunteers who have been convicted of certain felonies (the "Felony Volunteer Restriction"). Fla. Stat § 97.0575(1)(e). It requires 3PVROs to affirm that "each person collecting or handling voter registration applications" has not been convicted of a felony violation of the Election Code or a felony offense specified in Fla. Stat. § 98.0751(2)(b)-(c) or chapters 817, 831, or 837 of the Florida Statutes. SB 7050 subjects 3PVROs to a fine of $50,000 for every violation. *Id.*

B. <u>Non-U.S. Citizen Volunteer Restriction</u>

The second provision restricts the voter registration activities of non-citizens in a similar manner to the Felony Volunteer Restriction. It requires 3PVROs to affirm that "each person collecting or handling voter registration applications" on behalf of the 3PVRO is a United States citizen, and subjects 3PVROs to a fine of $50,000 for every violation (the

"Non-U.S. Citizen Volunteer Restriction"). Fla. Stat. § 97.0575(1)(f). The Non-U.S. Citizen Volunteer Restriction prohibits *all* non-U.S. citizens, including legal residents, from "collecting or handling" voter registration applications on behalf of 3PVROs. *Id.*

C. Receipt Requirement

SB 7050 requires 3PVROs to provide a "receipt" to every voter registration applicant that includes the applicant's name, the application date, the 3PVRO's name, the name of the registration agent, and the applicant's political party affiliation and home county (the "Receipt Requirement"). Fla. Stat. § 97.0575(4). Although the Law goes into effect on July 1, 2023, the state is not required to prescribe a "uniform format" for the receipt until October 1, 2023. *Id.*

D. Voter Information Restriction

SB 7050 prohibits a person collecting voter registration applications on behalf of a 3PVRO from copying the voter's application or "retain[ing] a voter's personal information, such as the voter's Florida driver license number, Florida identification card number, social security number, or signature, for any reason other than to provide such application or information to the [3PVRO] in compliance" with Section

7

97.0575 (the "Voter Information Restriction"). Fla. Stat. § 97.0575(7). Violation of this provision is a third-degree felony. *Id.* Though the statute gives examples of "personal information," it does not otherwise define the term.

## III. Impacts of the Law

The League is already experiencing the debilitating impacts of SB 7050. The League conducts voter registration activities throughout the year, with local chapters participating in multiple events per week. *See* Scoon Decl. ¶¶14-15. Some local chapters register hundreds or even thousands of voters in a single month. *See id.* ¶14.

SB 7050 has thrown the organization into a tailspin. Prior to the Law's passage, the League was planning to expand its registration efforts in advance of upcoming local elections and next year's statewide and presidential elections. *See id.* ¶¶15, 17-18. Already the League has diverted significant effort, staff time, and resources from its other activities to respond to and prepare for the implementation of SB 7050. *See id.* ¶¶20, 33, 41. Because of the dire consequences of SB 7050 on the League's operations, the League has decided that if the challenged laws are not enjoined, it will, at least temporarily, cease its regular voter

registration activity altogether, instead confining its activities to assistance with online registration and distributing blank paper applications. *See id.* ¶¶21, 33-34.[4]  Such a change will short circuit its ability to assist many voters, contrary to its mission and values. *See id.* ¶41.

The League utilizes a comprehensive online training program for its members who register voters. *See id.* ¶19. They are required to pass a test with a perfect score before being certified to register voters. *See id.* The Law would require the League to revamp and restructure its training, decertifying all qualified members and requiring them to retake the training. *See id.* ¶¶20-21. Some members would likely not do so. *See id.* ¶22. The League expects to see a significant drop in its pool of members who register voters that may take years to remedy. *See id.* The League had to decertify members after the passage of SB 90, and it took years to return to the number of members who register voters that it had in years prior. *See id.*

---

[4] Many of the Law's impacts discussed throughout this brief will apply if the injunction is not granted and the League decides to re-start its usual practice of performing voter registration services as a 3PVRO.

A. <u>Volunteer Restrictions</u>

The League does not collect information about members' felony conviction or citizenship status because its stated values include that "[t]here shall be no barriers to full participation in this organization on the basis of . . . any . . . characteristic that can be identified as recognizing or illustrating diversity." *See id.* ¶10. The League considers the values of "[d]iversity, equity, and inclusion" to be "central to the organization's current and future success." *See id.* However, the League is aware of members who have been convicted of disqualifying felonies and who are non-citizens whom it would have to prohibit from registering voters. *See* Declaration of Debra A. Chandler ("Chandler Decl.") ¶¶3-5, 10-11. Excluding certain members on this basis would be antithetical to the League's values and mission. *See id.* ¶¶6-8, 11-12; Scoon Decl. ¶¶11-12; Declaration of Monica Bustinza ("Bustinza Decl.") ¶¶5-6; Declaration of Kathy Sheerin ("Sheerin Decl.") ¶¶3-4. Asking questions about members' felony and citizenship status would be extremely uncomfortable for the League and invasive for its members. *See id.*

However, if the League does not ask these questions, it faces a fine of up to $50,000 per prohibited volunteer, a sum that could rapidly eclipse

the organization's budget. Being unable to utilize members who are themselves part of the very communities that the League focuses on would prevent the League from utilizing its most effective means of voter registration. *See* Chandler Decl. ¶¶ 8, 12.

Moreover, even if the League investigates its members and never inadvertently violates the Law, its voter registration efforts will be weakened. Some League members will be unable to register voters, while others will be forced to be more cautious about how they work with other volunteers. And the resources and time the League has expended on training mean there will be fewer registration events. Thus, the Volunteer Restrictions will lead to fewer registered voters.

B. <u>Receipt Requirement</u>

The League's work will be significantly impeded by the Receipt Requirement. First, the League will have to spend the time and resources to develop a receipt since the state need not provide a form until October. *See* Scoon Decl. ¶28. Further, League members have expressed concern, fear, and even unwillingness to participate in voter registration activities if they have to provide their names on a receipt. *See id.* ¶27; Declaration of Monica Elliott ("Elliott Decl.") ¶5; Bustinza Decl. ¶8; Sheerin Decl.

¶¶5-6. In particular, members fear being targeted by the Florida Office of Election Crimes and Security. *See* Scoon Decl. ¶27; Bustinza Decl. ¶8; Sheerin Decl. ¶¶6-7; Elliott Decl. ¶6. As with the Volunteer Restrictions, that means fewer League members will volunteer at voter registration drives, and the League will register fewer voters.

The Receipt Requirement combined with the Voter Information Restriction, discussed below, puts the League in an impossible position — it cannot keep a copy of the receipt to prove compliance. *See* Scoon Decl. ¶32; Sheerin Decl. ¶¶7-8. This leaves the League vulnerable to accusations of noncompliant registration without allowing members to retain the proof that they were, in fact, compliant. *See id.*

C. Voter Information Restriction

The Voter Information Restriction will also impair the effectiveness of the League's activities. Some local League chapters, with applicants' permission, retain applicants' name and contact information. *See* Scoon Decl. ¶29. This allows the League to follow up with voters to correct errors on their registration forms, to remind them of upcoming elections, and to recruit them to join the League. *See* Scoon Decl. ¶¶30-31. These activities are crucial to the effectiveness of registration efforts and

12

recruitment efforts, but the Voter Information Restriction will make them impossible and limits the League's ability to associate with others. *See* Scoon Decl. ¶¶30-31.

D. Risk Minimization

If the challenged laws are not enjoined, the League has decided to, at least temporarily, cease collecting paper voter registration applications and confine itself to online voter registration assistance.[5] *See* Scoon Decl. ¶¶21, 33-34. The risk is too great for the League to do anything else. *See* Declaration of Phyllis Applebaum ("Applebaum Decl.") ¶6.

The online method has meaningful disadvantages to the League's current system. *See id.* ¶¶35-40. Most significantly, the online system requires two forms of identification while paper registration only requires one, so some applicants will be excluded, especially in those communities that the League most strives to reach. *See id.* ¶38. And not all members and potential applicants have the technical proficiency to navigate the online system. *See id.* ¶36.

---

[5] Even before that decision was made, some members noted that planning new voter registration activities would be more difficult. *See* Bustinza Decl. ¶10. Some local Leagues had already stopped collecting voter registration applications altogether. *See* Sheerin Decl. ¶¶8-14.

Further, switching to online-only registration will require significant financial outlay, including the cost of purchasing laptops, tablets, and Wi-Fi hot spots. *See id.* ¶35. On a fixed budget, this would mean that a limited number of people could register to vote at one time and a limited number of members would be able to help with that process. *See id.* The need to charge the technology and the need for an internet connection would limit the settings and duration of the League's voter registration events. *See id.* ¶36. Moreover, the online system would not allow League members to review registration forms in the thorough manner that is its current policy, *see id.* ¶37, and online registration does not facilitate the personal connection between the League and applicants that is vital to creating trust, *see id.* ¶39. In the longer term, without collecting forms and utilizing the 3PVRO number on those forms, the League cannot effectively track the number of voters it registers, impacting its ability to get grants and fundraise in a way that is critical to continuing its voter registration efforts and its overall mission. *See id.* ¶40.

## LEGAL STANDARD

Plaintiffs seeking a preliminary injunction must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm absent an injunction; (3) the harm they will experience outweighs any injury the opposing party may experience under the injunction; and (4) the injunction would not be adverse to the public interest. *See Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 860 (11th Cir. 2020).

## ARGUMENT

## I.   **Plaintiffs have standing**

To establish standing, a "litigant must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Secy of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citation omitted). In First Amendment cases, this standard is "most loosely applied" to provide broad speech protections. *Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001).

Here, the League has both organizational and associational standing. A group has organizational standing "if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization

to divert resources to counteract those illegal acts." *Jacobson*, 974 F.3d at 1250 (quotation marks and citation omitted). And organizations can show associational standing, enforcing the rights of their members, when (a) members would have standing to sue on their own; (b) the interests at stake are related to the organization's purpose; and (c) the participation of individual members is not required. *See Dream Defenders v. Governor of the State of Fla.*, 57 F.4th 879, 886 (11th Cir. 2023).

A. <u>The League has organizational standing</u>

The League has organizational standing because all four challenged provisions will directly stifle its protected activities and harm its effort to engage more voters. The League has determined that compliance with SB 7050 would be so costly and dangerous that, absent an injunction, it plans to temporarily cease collecting voter registration applications altogether. Not only will that require the League to spend money, *see* Scoon Decl. ¶35, it demonstrates that the Law has caused the League to self-censor, creating a First Amendment harm. *See Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022).

To comply with SB 7050, the League would be forced to divert time and resources from other projects to counteract SB 7050's effects. First,

it would need to overhaul its training system and retrain every member who conducts voter registration — over 1,000 people — so that they (1) are aware that they cannot volunteer if they are non-citizens or have been convicted of certain felonies, and that they cannot work with people in either of those categories; (2) understand how to provide receipts to applicants; (3) know that they could be charged with a felony if they retain an applicant's personal information. *See* Scoon Decl. ¶29. Because this training is vital to avoiding massive fines and felony convictions, the League will pause its paper voter registration activity at least until it ensures that every affected member understands the Law and agrees to comply with it. *See id.* ¶¶21, 33-34. Absent SB 7050's burdensome requirements, League leaders, staff, and members would spend more time registering voters, organizing voter registration drives, training members about more effective methods of registering voters, or conducting other League business. *See id.* ¶¶20, 41.[6] *See Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1165-66 (11th Cir. 2008) (holding that groups had organizational standing when they "reasonably

---

[6] For example, at its recent convention, the League cancelled a workshop to train members on its diversity, equity, and inclusion policy so it could focus discussion and training on SB 7050's requirements. *See* Scoon Decl. ¶20.

anticipate[d] that they [would] have to divert personnel and time" away from registration drives and toward "educating volunteers and voters on compliance with" the law).

To continue to register voters, the League would also have to investigate each of its members who registers voters to ensure that those members are citizens without disqualifying felony convictions. *See* Scoon Decl. ¶10-11. Aside from diverting time and resources as described above, that investigation and the exclusion of non-citizens and people with convictions will harm the League because it conflicts with the organization's core values — the League does not ask its members whether they are citizens or have been convicted of a felony and welcomes non-citizens and returning citizens to their membership. Inquiring into these topics, and excluding individuals from core membership activities on these bases, conflicts with its diversity, equity, and inclusion policy. *See id.*

Further, even if registration drives happen in the future, they will be less effective. Fewer League members will register voters because they fear personal exposure from the Receipt Requirement or felony prosecution from the Voter Information Restriction. And because

volunteers cannot retain personal information of applicants, the League will be unable to contact them to notify them of an incomplete application, remind them to vote, or ask them to join the League. All that will result in fewer registered voters, lower voter turnout, and fewer League members.

And the largest potential resource drain will occur if the League inadvertently violates the Volunteer Restrictions. If that happens even once, the League will be subject to a $50,000 fine, which amounts to almost one-fifth of its annual budget. *See id.* ¶9. If it happens a handful of times, the League's entire budget will be wiped out. Without question, such a financial loss will prevent the League from retaining its few staff members, organizing its statewide convention, or performing other functions core to its mission. *See id.* ¶¶20, 41.

B. <u>The League has associational standing</u>

The League has clearly established associational standing as well. First, many members would have standing to sue on their own. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014) (noting that "plaintiffs need only establish that at least one member faces a realistic danger of suffering an injury" to establish associational standing)

(quotation marks and citation omitted). Here, all League members who perform registration services will be put at risk of felony prosecution for retaining the personal information of any applicant, and therefore will be unable to later speak with those applicants. And all of them will be able to associate with fewer volunteers, because they will know that working with non-citizens or people with disqualifying felonies would create financially ruinous liability for the League. Those members will also be able to register fewer voters because they will need to undergo additional training provided by the League and divert their own time to filling out a receipt each time they register a voter. Finally, some will be deterred from registering voters at all because they do not want to provide their name on the applicant's receipt. *See* Scoon Decl. ¶27.

The second and third prongs of the associational standing test are easily met. The interests the League is trying to protect — helping its members register more voters — is unquestionably "germane to the organization's purpose." *Arcia*, 772 F.3d at 1342. And the state can make no showing that participation of individual members is required to achieve the injunctive relief sought here. *See id*.

*   *   *

Without question, all of these harms are traceable to defendants, and the injuries of the League and its members will be redressed by an injunction here. Defendants are charged with enforcing and administering SB 7050, *see* Fla. Stat. §§ 97.0575(8), 97.012(1)-(2), and enjoining the Law will ensure that the League does not have to follow the burdensome requirements SB 7050 creates.

## II.   Plaintiffs are substantially likely to succeed on the merits of their claims

The League's voter registration activity is "core political speech," associational activity, and expressive conduct protected by the First Amendment. *Meyer v. Grant*, 486 U.S. 414, 421-22 (1988); *see also Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 187 (1999). Thus, the Court must apply strict or "exacting" scrutiny to any restrictions that curtail that activity. *Meyer*, 486 U.S. at 420.[7] The challenged laws fail that test.

---

[7] The Supreme Court and other federal courts have used the terms exacting scrutiny and strict scrutiny somewhat interchangeably. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 n. 10, 347 (1995) ("In *Meyer*, we unanimously applied strict scrutiny to invalidate an election-related law."); *VoteAmerica v. Schwab*, No. CV 21-2253-KHV, 2023 WL 3251009, at *13 (D. Kan. May 4, 2023) (relying on *Meyer* and applying strict scrutiny).

A. <u>The League is likely to succeed on its First Amendment claims</u>

    1. *The court must apply strict or exacting scrutiny*

       a. Free speech and expressive conduct

Courts have repeatedly held that "the First Amendment has its fullest and most urgent application" to speech and conduct encouraging people to register to vote and assisting them with registration. *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 722 (M.D. Tenn. 2019) (citation and quotation marks omitted); *see also League of Women Voters of Fla. v. Browning,* 863 F. Supp. 2d 1155, 1158 (N.D. Fla. 2012) ("encouraging others to register to vote" is "core First Amendment activity"); *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1332 (S.D. Fla. 2006). That is because laws curtailing voter registration activity substantially proscribe communication with potential voters about political issues, leading to "'speech diminution.'" *Hargett*, 400 F. Supp. 3d at 723 (quoting *Meyer*, 486 U.S. at 421); *see also Cobb*, 447 F. Supp. 2d at 1332 (analogizing 3PVRO requirements to those in *Meyer*, which "reduced speech"). And laws that so directly affect political speech, regardless of whether they purport to regulate the mechanics of the electoral process, cannot stand unless they meet the standard outlined in

*Meyer*. *See Hargett*, 400 F. Supp. 3d at 725; *Priorities USA v. Nessel*, 462 F. Supp. 3d 792, 812 (E.D. Mich. 2020).

The *Meyer* standard applies here. In *Meyer*, the plaintiffs attempted to engage others in the political process by gathering petition signatures in support of a proposed ballot initiative. A Colorado law prevented the plaintiffs from paying petition circulators, limiting "the size of the audience they [could] reach." *Meyer*, 486 U.S. at 423. The Supreme Court invalidated the law and explained that because the state restricted speech in "an area in which the importance of First Amendment protections is 'at its zenith,'" Colorado's burden to justify the law was "well-nigh insurmountable." *Id*. at 425.

Here, just as in *Meyer*, the League seeks to encourage others to participate in the political process, and their voter registration activity involves "interactive communication concerning political change." *Id*. at 422. Whether a person should become a registered voter is a "matter of societal concern that [Plaintiffs] have a right to discuss publicly" without risking massive penalties, and burdens on the League's voter registration activity will reduce the size of their audience and reduce their total amount of speech. *Id*. at 421; *see also Cobb*, 447 F. Supp. 2d at 1332.

The fact that the Law does not directly prohibit League volunteers from discussing voter registration or performing certain other registration activities does not affect the standard applied here. The Supreme Court has explained that the availability of "other means to disseminate [a plaintiff's] ideas" does not diminish First Amendment protection for that person's chosen means of communication. *Meyer*, 486 U.S. at 424 (holding that availability of "more burdensome avenues of communication[ did] not relieve [law's] burden on First Amendment expression") (quotation marks and citation omitted); *see also Hargett*, 400 F. Supp. 3d at 721 ("Because the Act regulates traditional voter registration drives, which include central elements of expression and advocacy, it does not matter that the Act would not apply to some other hypothetical activity that a group might concoct specifically to evade the Act's requirements.").[8]

The challenged laws are also content- and viewpoint-based restrictions on speech. Viewpoint-based restrictions are prohibited "seemingly as a *per se* matter," *Speech First,* 32 F.4th at 1126, while

---

[8] Nor can defendants successfully argue that the aspects of assisting with voter registration covered here constitute non-expressive conduct. The "collection and submission of voter registration" applications "is intertwined with speech and association" and therefore qualifies for the strongest First Amendment protection. *Cobb*, 447 F.Supp. 2d at 1334 (rejecting state's argument that regulation of collection of voter registration applications was not expressive).

content-based restrictions "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (citation omitted).

A viewpoint-based restriction "discriminate[s] on the basis of viewpoint" by "prohibit[ing] only one perspective" on a given issue. *Speech First*, 32 F.4th at 1126-27. Here, the challenged laws target only 3PVROs like the League that *support* voter registration; those who wish to persuade people not to register or to deregister are unaffected by the Law. And the challenged laws are unquestionably content-based because they "appl[y] to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. The Law restricts speech on only one topic: voter registration.

### b. Free association

The *Meyer* standard also applies when assessing the challenged laws' burden on the League's right to freely associate with others. There is no question that "the freedom to associate with others for the common advancement of political beliefs and ideas is a form of orderly group activity protected by the First and Fourteenth Amendments." *Kusper v.*

*Pontikes*, 414 U.S. 51, 56-57 (1973) (quotation marks and citation omitted). And when the League conducts voter registration activities, it "act[s] collectively" with its members and volunteers, and seeks to do so with potential voters, "implicating the First Amendment right of association." *Browning*, 863 F. Supp. 2d at 1158.

SB 7050 severely harms the League's associational rights. The Volunteer Restrictions will prevent certain League members from performing voter registration functions for the League and prohibit the League from working with entire classes of Floridians at voter registration drives, its core membership activity. *See N.A.A.C.P. v. Button*, 371 U.S. 415, 430, 437 (1963) (affirming that First and Fourteenth Amendments "protect certain forms of orderly group activity," including by "persuad[ing] to action"); *see also Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) (recognizing right of associations to choose their members). Those restrictions will also force the League to investigate its own members in a manner contrary to its own values. Meanwhile, the Receipt Requirement will reduce the number of members the League may use for voter registration drives, because some members will refuse to participate if they must disclose their names to the public.

26

And the League will be unable to grow and associate with prospective voters as it normally does, because the Voter Information Restriction will prevent it from keeping applicants' contact information.

Because the challenged laws impose a severe burden on those associational activities, they "must be narrowly tailored to serve a compelling interest." *Buckley*, 525 U.S. at 206 (Thomas, J., concurring in the judgment).[9]

### 2. *The challenged laws cannot survive strict or exacting scrutiny*

Because the scrutiny standards from cases such as *Meyer* and *Reed* must be applied, the challenged laws can be upheld only if they are narrowly tailored to serve a compelling state interest. *See Reed*, 576 U.S. at 163. As noted, that burden is "well-nigh insurmountable." *Meyer*, 482 U.S. at 425; *see also McIntyre*, 514 U.S. at 346 n. 10, 347 (describing *Meyer* standard as "strict scrutiny" and outlining exacting scrutiny analysis). But none of the challenged laws can clear that high bar.[10]

---

[9] Notably, courts have also recognized a First Amendment right to associate with non-citizens. *See, e.g.*, *Petersen v. Talisman Sugar Corp.*, 478 F.2d 73, 83 (5th Cir. 1973); *Haitian Refugee Ctr., Inc. v. Baker*, 789 F. Supp. 1552, 1572 n. 11 (S.D. Fla. 1991) (noting that "the Supreme Court has recognized a first amendment right to associate with an excluded alien").

[10] Even if the Court were to review the challenged laws under the *Anderson-Burdick* test that applies to regulations that "control the mechanics of the electoral process," *McIntyre*, 514 U.S. at 345, there is little difference between the *Meyer* standard and the close scrutiny applied under *Anderson-Burdick* when considering regulations on core political speech, which are necessarily severe. *See Curling v. Raffensperger*, 50 F.4th 1114, 1122 (11th Cir. 2022) (noting that under *Anderson-Burdick*, "[i]f we

Indeed, the challenged laws cannot survive any level of meaningful scrutiny.

a. The Volunteer Restrictions

Florida has no legitimate interest in preventing non-citizens or people with certain felony convictions from "collecting or handling" voter registration applications. Fla. Stat. § 97.0575(1) (e), (f). Of course, the state may seek to protect the integrity of its elections and prevent identity theft or other fraud on registration applicants, but there is no basis to believe that the Volunteer Restrictions will serve those interests. Instead, the restrictions are a transparent attempt to make it more difficult for groups like the League to register voters and to dictate who the League and other similar 3PVROs can include in their membership activities.

The legislature passed the Non-U.S. Citizen Volunteer Restriction on the apparent belief that allowing "illegal[s]" to handle voter registration applications would threaten Floridians' "sensitive information."[11] Yet the Supreme Court has repeatedly held that there is

_____

conclude that the State's policy imposes a severe burden on the right to vote, we subject the policy to strict scrutiny").

[11] Fla. Senate Floor Debate on SB 7050, at 48:45-49:02 (Apr. 26, 2023), *available at* https://www.flsenate.gov/media/VideoPlayer?EventID=1_nty0d3lq-202304261000.

no legitimate basis for categorically excluding non-citizens from certain occupations or employment. *See, e.g.*, *Bernal v. Fainter*, 467 U.S. 216, 220 (1984). Those decisions are based on the foundational (and unsurprising) conclusion that a person's citizenship status is irrelevant to whether they will perform a certain function with integrity.[12] *See id.* (invalidating state law prohibiting non-citizens from becoming notaries despite Court's recognition of "the critical need for a notary's duties to be carried out correctly and with integrity"); *In re Griffiths*, 413 U.S. 717, 724 (1973) (invalidating prohibition on non-citizen bar membership despite argument that lawyers must maintain public confidence and allegiance to United States).

And while Florida may prevent non-citizens from registering to vote, the state cannot plausibly argue that allowing non-citizens to collect and handle voter registration forms will somehow encourage unlawful or inaccurate voter registration. Moreover, non-citizens frequently perform voter registration services and other civic duties and occupations, and the state can point to no evidence showing that they are likely to persuade

---

[12] Though the Court has made exceptions for positions "closely bound up with the formulation and implementation of self-government," *Bernal*, 467 U.S. at 221, that category certainly does not apply to a person who merely assists a 3PVRO with voter registration applications.

others to act unlawfully. *See* Chandler Decl. ¶10; *Griffiths*, 413 U.S. at 722.

Further, the Non-U.S. Citizen Volunteer Restriction is in no way tailored to actually protect the integrity of Florida's elections. Most fundamentally, it makes no distinction between non-citizens who are legal residents and those who are undocumented; there can be no rational basis for preventing those who are lawfully present in the United States from participating in voter registration activities. *See Estrada v. Becker*, 917 F.3d 1298, 1309 (11th Cir. 2019) (concluding that laws merited different level of scrutiny depending on whether they affected people "lawfully admitted to the United States" or "illegal aliens").

The provision is also overinclusive because it prevents all "collecting and handling" of voter registration applications. Though that phrase is vague, it almost certainly prevents a volunteer from working under the League's supervision to simply distribute blank voter registration forms at a voter registration drive or gather completed forms to give to a League member. The statute could easily target the alleged

concern more directly by trying to prevent covered volunteers from retaining sole control over any application.[13]

Moreover, the state is unlikely to show that before SB 7050 was enacted, Florida law failed to sufficiently prevent voter fraud and identity theft in this context. *See, e.g.*, Fla. Stat. §§ 104.011(2) (providing that willful submission of false voter registration information is third-degree felony); 817.568 (criminalizing identity theft); *Meyer*, 486 U.S. at 426-27 (state failed to show that challenged procedures were necessary where pre-existing procedures were "adequate to the task of minimizing the risk of improper conduct.")

Nor does the statute's penalty scheme fit any rational state interest. It targets only 3PVROs like the League for associating with certain volunteers. And it imposes staggering penalties — $50,000 per violation — on a strict-liability basis, punishing 3PVROs regardless of whether they have diligently checked to try to ensure that none of their volunteers are non-citizens. *See Am.-Arab Anti-Discrimination Comm. v. City of*

---

[13] Of course, for the reasons described above — principally, that the Non-U.S. Citizen Volunteer Restriction serves no important state interest — even a law without the egregious tailoring problems discussed here would not withstand scrutiny.

*Dearborn*, 418 F.3d 600, 612-13 (6th Cir. 2005) (invalidating parade ordinance because it created "strict liability regime").

The Felony Volunteer Restriction also fails under *Meyer*'s standard. As an initial matter, even if people with felony convictions may lose their right to vote, they do not lose the protection of the First Amendment. *See, e.g.*, *Packingham v. North Carolina*, 582 U.S. 98, 108 (2017) (invalidating law limiting sex offenders' internet access and explaining that "convicted criminals . . . might receive legitimate benefits from these means for access to the world of ideas"); *Hand v. Scott*, 285 F. Supp. 3d 1289, 1306 (N.D. Fla. 2018) (*vacated on other grounds sub nom. Hand v. DeSantis*, 946 F.3d 1272 (11th Cir. 2020)) ("It is legal chicanery to argue an individual convicted of a crime loses her First Amendment associational and expressive interests in the political sphere simply because these rights relate to voting.").

And although Florida may protect potential voters from identity theft and protect the integrity of its elections, the state cannot make any showing that people convicted of the vast array of included felonies are likely to commit crimes while assisting with voter registration. *See Johnson v. City of Cincinnati*, 310 F.3d 484, 503, 506 (6th Cir. 2002)

(invalidating law limiting travel of people who committed certain drug offenses in part because general evidence of likely recidivism was "insufficient" to override constitutional rights to association and travel).

For a host of reasons, the Felony Volunteer Restriction is not well-tailored to prevent fraud or identity theft, protect election integrity, or serve any other legitimate interest — there are unquestionably "other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity." *Dunn v. Blumstein*, 405 U.S. 330, 343 (1972).

First, the long list of felony convictions that makes a person ineligible to assist a 3PVRO includes entire chapters of the criminal code; many of the felonies in those chapters are the lowest-level felonies and have no conceivable bearing on whether someone is likely to capably and honestly collect and handle voter registration forms. To name just a few examples, the Law disqualifies people who have been convicted of charging too much money for debt management services; unlawfully subleasing a car; "fraudulently alter[ing] or chang[ing] the marks of any animal"; or violating a fiduciary duty by "wasting" the assets of an elderly person. Fla. Stat. §§ 817.802(1); 817.5621; 817.26; 825.103(1)(c). Further,

the Law contains no exception for people who have been convicted of felonies but have had their voting rights restored. Aside from that, SB 7050 appears to rescind a person's First Amendment rights forever regardless of later circumstances — a person who had been convicted of a third-degree felony for one of the crimes listed above would still be unable to help register voters forty years later, even if they had long ago completed their sentence and had their voting rights restored. These failures to tailor the Law demonstrate that the legislature had no genuine interest in protecting Florida's elections or its residents.

The Felony Volunteer Restriction also suffers from some of the same tailoring problems as the Non-U.S. Citizen Volunteer restriction discussed above: it prohibits all collecting and handling of voter registration forms, regardless of whether a volunteer is supervised by other League members and would have no opportunity to engage in fraudulent practices. It focuses enforcement and penalties entirely on the 3PVRO in question without regard to whether the 3PVRO has done everything in its power to comply with the Law. And it fails to account for existing laws that prevent voter registration fraud and identity theft.

b.  The Voter Information Restriction

The Voter Information Restriction makes it a third-degree felony to copy a voter's registration application or "retain[] a voter's personal information." Fla. Stat. § 97.0575(7).[14] While the state's only conceivable interest in maintaining such a restriction is to protect the privacy of applicants' information, it falls woefully short of meeting *Meyer*'s standard. *See Hargett*, 400 F. Supp. 3d at 726 (holding that state's ban on retention of applicants' information without consent did not withstand exacting scrutiny).[15]

The Voter Information Restriction fits poorly with any interest in protecting applicants' private information. Although the statute includes examples of information that may not be retained, it applies to all "personal information," which would include an applicant's name and telephone number — the very information the League needs for reminding someone to vote, contacting them to notify them of an error on a completed registration form, or recruiting them to become a League

---

[14] The law allows retention of personal information for the purposes of "provid[ing] [it] to the third-party voter registration organization in compliance with this section." But as described in Section II.C., *infra*, that language is too vague to ensure that protected uses of applicant information are not punished.

[15] The Voter Information Restriction is even more burdensome than the one invalidated in *Hargett* because it contains no exception for applicants who consent to share their information.

member. *See* Scoon Decl. ¶¶30-31; *Hargett*, 400 F. Supp. 3d at 726 (noting 3PVRO's interest in "following up with registrants to facilitate their voting and communicate with them about issues"). And that basic contact information, in contrast to sensitive information like a social security number, is simply not the kind of information that must be protected to serve any state interest in protecting applicants' privacy. That is made even clearer by the fact that applicants' information is publicly available on the Secretary of State's website, and that the NVRA requires the state to maintain a public list of the names and addresses of certain applicants. *See* 52 U.S.C. § 20507(i).

Further, there is no apparent reason for "specific requirements that apply to the retention of information from voter registration drives but to none of the other myriad situations in which individuals hand over their information to third parties." *Hargett*, 400 F. Supp. 3d at 726. Unless the state can show why retention of basic contact information as a part of voter registration activities is particularly threatening, it cannot justify the burden the Voter Information Restriction creates.

Finally, the provisions in the Receipt Requirement that conflict with the Voter Information Restriction help demonstrate that the Law is

not sufficiently tailored to protect privacy. The Receipt Requirement mandates that 3PVROs provide every applicant with a receipt that includes the applicant's name, political party affiliation, and county of residence, among other things. Fla. Stat. § 97.0575(4). Of course, unless members retain a copy of those receipts, the League will be unable to track and demonstrate its compliance with SB 7050. Thus, either the challenged laws place 3PVROs in the impossible situation of exposing themselves to liability without any opportunity to maintain records to show their compliance, or the Receipt Requirement undercuts any argument that the Voter Information Restriction is a permissible attempt to protect applicants' private information.

### c. The Receipt Requirement

As noted, the Receipt Requirement compels League members to provide every applicant with a receipt that includes not only information about the applicant, but the name of the person assisting with registration. *Id*. But no acceptable state interest justifies that requirement, which not only discourages League members from assisting with voter registration, but adds one more logistical burden for all 3PVROs.

37

It is difficult to conceive of an important state interest that could support the Receipt Requirement — especially the component requiring volunteers to provide their names. While the state may argue that it seeks to deter fraud by requiring those assisting with voter registration to identify themselves, voluminous Supreme Court precedent demonstrates that that interest is nowhere near important enough to outweigh the First Amendment rights at issue. *See Buckley*, 525 U.S. at 198 (striking down Colorado requirement that petition circulators wear identification badges despite state's interest in apprehension of circulators who commit misconduct); *McIntyre*, 514 U.S. at 348-49 (invalidating ban on anonymous leaflets intended to prevent fraud). And as in *Buckley*, the state could choose other methods of deterring misconduct that do not require volunteers "to reveal their identities at the same time they deliver their political message." 525 U.S. at 199 (quotation marks omitted).

B. The League is likely to succeed on its overbreadth claims

Even if the challenged laws were permissible in some applications, they would fail because they are overbroad. Under the First Amendment, "[a] regulation that covers substantially more speech than the First

Amendment allows is overbroad and thus invalid." *Speech First*, 32 F.4th at 1125.

The Volunteer Restrictions are overbroad because they reach far beyond any reasonable scope of the state's interest in ensuring competent and honest performance of voter registration assistance. SB 7050 prevents all covered volunteers from performing prohibited activities, even if they are in public and supervised by other experienced voter registration agents, covering far more speech than needed.

And even if the state had some interest in forbidding certain non-citizens or some people with felony convictions from assisting with voter registration (it does not), the categories of forbidden volunteers are unconstitutionally broad. The Law forbids *all* non-citizens from taking part in voter registration, even if they are legal residents who have never done anything to indicate that the state should feel compelled to restrict their First Amendment rights. *See* Section II.A.2.a., *supra*; *Estrada*, 917 F.3d at 1309. And likewise, the Felony Volunteer Restriction applies to potential volunteers who have been convicted of crimes that provide no indication they are likely to commit fraud or otherwise dishonestly

register voters on behalf of the League, as well as to people with decades-old convictions and those whose rights have been restored.

This problem is exacerbated by SB 7050's strict liability standard. *See Dream Defenders*, 57 F.4th at 892 (noting that determination of law's mens rea requirement was necessary as part of overbreadth analysis). The League faces a $50,000 fine each time either of the Volunteer Restrictions is violated, even if it has diligently investigated the background of each of its volunteers. Because there is no requirement that 3PVROs know or should know that a volunteer is disqualified, the Law fails to properly target the activities it purports to prohibit and will discourage voter registration activity that the Law allows. *See id.*; *United States v. Kelly*, 625 F.3d 516, 522 (8th Cir. 2010) (invalidating special release condition on overbreadth grounds and noting that condition's "sweeping reach" was "magnified by its strict-liability phrasing").

The Voter Information Restriction and Receipt Requirement are overbroad as well. Though the state could likely find a permissible way to protect the privacy of an applicant's sensitive information, SB 7050 prohibits all retention of applicants' "personal information." § 97.0575(7). That will prevent the League from retaining basic contact information

for follow-up regardless of whether the applicant requests such communication. Similarly, if there were a justifiable state interest in requiring League volunteers to provide every applicant a receipt, that interest could not justify requiring a volunteer to disclose their name on that receipt. Thus, even if portions of the two restrictions could be permissibly applied in some circumstances, they plainly "cover[] substantially more speech than the First Amendment allows." *Speech First*, 32 F.4th at 1125.

C. The League is likely to succeed on its vagueness claims

The four challenged provisions are also impermissibly vague. A statute is vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *League of Women Voters of Florida v. Fl. Sec. of State*, 66 F.4th 905, 946 (11th Cir. 2023) (quotation marks and citation omitted). The challenged parts of SB 7050 suffer from both problems.

The Volunteer Restrictions are vague because they do not define what it means to "collect[] or handl[e]" voter registration applications. § 97.0575(1) (e), (f). *See Dream Defenders*, 57 F.4th at 890 (a law is "void

41

for vagueness if its prohibitions are not clearly defined") (quotation marks and citation omitted). Most problematically, the word "handle" can mean "to manage with the hands" or "to have overall responsibility for supervising or directing."[16] The Law likely prevents covered volunteers from physically touching completed voter registration applications during a registration drive. But it is not clear whether those volunteers could translate for League members who are helping someone register, supervise other volunteers who physically collect forms, greet applicants at a welcome table, ask passersby to complete forms, or drive a car with completed applications to a League member. *See*, *e.g.*, *Priorities USA*, 462 F. Supp. 3d at 817 (holding that law forbidding "hir[ing]" of motor vehicle to assist voters to reach polls was likely impermissibly vague). Because the statute does not answer those questions, the Law fails to provide sufficient guidance to 3PVROs and would allow the state to arbitrarily enforce it.[17]

---

[16]          *Handle*,          Merriam-Webster          Dictionary,          https://www.merriam-webster.com/dictionary/handle#dictionary-entry-2 (last visited Jun. 7, 2023).

[17] Notably, § 97.0575 does not distinguish between (1) "registration agent[s]," who are required to provide their name on the receipt they give to voter registration applicants, Fla. Stat. § 97.0575(4); (2) people who "collect[] or handl[e]" applications, who are subject to the Volunteer Restrictions, Fla. Stat. § 97.0575(1) (e), (f); and (3) people who simply "collect" applications, who are subject to the Voter Information Restriction. Fla. Stat. § 97.0575(7).

The Felony Volunteer Restriction is plagued by additional vagueness because it fails to specify the full scope of people disqualified. While the Law lists many offenses, it fails to address whether people who have been convicted but have had their voting rights restored or have been pardoned are nevertheless included. Further, it does not explain whether 3PVROs may rely on volunteers who have been convicted of comparable felonies under federal law or in other states. For example, while the League may not work with a volunteer who has been convicted of insurance fraud under Fla. Stat. § 817.234, it remains unclear whether it may work with a person who committed the same fraudulent act but was convicted under Georgia Code § 33-1-9, which prohibits similar conduct.

The Voter Information Restriction and Receipt Requirement are also impermissibly vague, especially when considered together. First, the Voter Information Restriction purportedly prohibits the retention of *any* "personal information," although it lists some examples. This provision leaves 3PVROs without a reasonable understanding of the state's requirements, and would allow the Division of Elections to refer a

volunteer for felony prosecution for simply retaining an applicant's name and telephone number, even with the applicant's consent.

However, the League faces an even more difficult question, because the Law also requires it to provide a detailed receipt to every applicant, and that receipt must contain the applicant's name and home county. § 97.0575(4). The obvious way to track compliance with that requirement is to keep a copy of each receipt. *See* Scoon Decl. ¶32. But doing so could lead to felony prosecution.[18] This stark lack of guidance means that the Law must be invalidated on vagueness grounds.

*     *     *

In sum, the League is overwhelmingly likely to succeed on the merits on all four of the provisions challenged here. Each one seriously infringes on the League's First Amendment rights, and none of the four serves a compelling or even important state interest. And even if any of them did, none of the challenged laws is well-tailored to serve those interests. Further, all four are overbroad because they regulate activity

---

[18] The law allows for a person collecting registration applications to retain voter information "to provide such . . . information to the [3PVRO] in compliance with this section." *Id.* Yet nowhere does Section 97.0575 describe what "compliance" means when a volunteer provides completed applications to the 3PVRO. It does not provide that a volunteer may copy a receipt given to an applicant and give the receipt to a 3PVRO. Nor does it provide that a volunteer may retain an applicant's contact information (with or without the applicant's consent) and give that information to the 3PVRO.

far beyond what is conceivably necessary to achieve a permissible goal, and they are vague because they do not allow the League to fully understand what activities they prohibit.

## III.  Plaintiffs will suffer irreparable harm absent relief

A preliminary injunction is appropriate if "'irreparable injury will be suffered unless the injunction issues.'" *Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238, 1284 (N.D. Fla. 2021) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000)). An injury is irreparable if it "cannot be undone through monetary remedies." *League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1223 (N.D. Fla. 2018) (quoting *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987)).

As such, "'[a]n ongoing violation of the First Amendment constitutes an irreparable injury.'" *Dream Defs.*, 559 F. Supp. 3d at 1285 (quoting *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017)); *see also City Walk - Urb. Mission Inc. v. Wakulla Cnty. Fla.*, 471 F. Supp. 3d 1268, 1287 (N.D. Fla. 2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable harm.").

In the context of voter registration and elections, the irreparable nature of an injury is heightened because "[o]nce the election comes and goes, 'there can be no do-over and no redress.'" *Detzner*, 314 F. Supp 3d at 1223 (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)); *see, e.g.*, *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1258 (N.D. Fla. 2016) (quoting *League of Women Voters of N.C.*, 769 F.3d at 247) ("'[I]f aspiring eligible Florida voters are barred from registering to vote then those voters are stripped of one of our most precious freedoms.'").

The potentially ruinous nature of the Law's penalties has already caused the League to move at least temporarily to online registration, a drastic change to its method of registering voters that alters the very nature of its work and renders its voter registration activities significantly less effective. *See* Scoon Decl. ¶¶21, 33-34, 41. And any future efforts as a 3PVRO will be irreparably harmed as well.

A. <u>The Volunteer Restrictions will cause irreparable harm</u>

The League is unquestionably experiencing, and will continue to experience, irreparable harm in the absence of injunction. When the Law goes into effect, the League will no longer be able to associate with

members in the way that it chooses due to the Volunteer Restrictions. *See* Scoon Decl. ¶¶ 10-12, 24-25, 31-32. In preparation for the Law to go into effect, the League will be forced to ask invasive questions that are antithetical to its core mission to determine whether members have prior felony convictions or are non-citizens. *See id.* ¶¶11-12; Elliott Decl. ¶8; Bustinza Decl. ¶ 6; Sheerin Decl. ¶¶3-4. These First Amendment injuries cannot be "undone through monetary remedies." *Detzner*, 314 F. Supp. 3d at 1223.

If the League chooses not to ask these questions due to that harm, the League will face debilitating monetary penalties that could completely deplete its annual budget. *See* Scoon Decl. ¶9. And if it does ask the questions but accidentally allows a disqualified person to assist with registration, the penalties will be the same.

Even if the League is never penalized, the Volunteer Restrictions will prevent it from registering voters in the way that has historically been most effective. *See* Chandler Decl. ¶¶7-8, 11-12. It will significantly reduce the number of volunteers available because all members who register voters will have to be retrained and recertified; such retraining has previously led to a drop in the number of members willing to do that

work. *See* Scoon Decl. ¶¶20-22. This will ultimately reduce the number of voters the League will be able to register.

Moreover, the Law does not clarify who exactly who is barred from participation in voter registration. And given the vagueness of the phrase "collect[] or handl[e]" it is also unclear whether those affected individuals could play any role at all in the registration process. Thus, even if the League invests in the retraining necessitated by SB 7050, it will be unable to sufficiently inform its members how to proceed. As voter registration deadlines pass and elections go by, this results in an injury for which "there can be no do-over and no redress." *Scott*, 215 F. Supp. 3d at 1258.

B. <u>The Voter Information Restriction and Receipt Requirement will cause irreparable harm</u>

The Voter Information Restriction and Receipt Requirement similarly are causing and will continue to cause the League irreparable harm. First, the unanswered question of how to comply with both the Voter Information Restriction and prove compliance with the Receipt Requirement has already led to uncertainty that will affect the League's training process and the success of its registration drives.

In addition, members have stated that they will discontinue participation in not register voters if they are required to provide their names on a receipt. *See* Scoon Decl. ¶27; Elliott Decl. ¶¶5-7. Fewer members engaged in voter registration means fewer voters registered. *See* Scoon Decl. ¶23. Further, it will take time for the organization to develop and implement a receipt process, meaning it will miss opportunities to register voters in the meantime, not to mention the cost of creating and distributing the receipts.

The Voter Information Restriction will prevent the League from following up with voters, reducing the League's effectiveness in voter registration even further. The League will also miss out on the opportunity for new applicants to become League members. *See* Scoon Decl. ¶¶29-31. Overall, these restrictions reduce the effectiveness of the League's voter registration activities and will prevent it from effectively recruiting and retaining members.

                              *     *     *

The Law will take effect on July 1, 2023, only a few weeks from today. Considerable resources and staff time are being diverted from the League's other programs and initiatives to figure out a plan for

compliance, adjust training materials, and determine the League's path forward. *See id.* ¶¶20-21, 28, 33-34. As noted, the vagueness of the Law makes precise planning impossible, meaning that the League is unable to provide its members and local chapters with the definitive guidance needed to move forward. *See id.* ¶¶33-34; Bustinza Decl. ¶10.

The League engages in voter registration in an ongoing manner throughout the year, meaning that the diversion of resources and staff time as well as the redevelopment of training materials and restructuring of the voter registration process are affecting the League's activities now, and the impact will be fully realized if the Law is not enjoined immediately. *See* Scoon Decl. ¶¶14-18, 20-21, 28, 33-34, 41.

## IV. The balance of equities weighs in Plaintiffs' favor, and a preliminary injunction is not adverse to the public interest

The grievous injury to the League's First Amendment rights outweighs any interest that Florida has in enforcing the challenged laws, and the public will be served by a preliminary injunction. *See Otto*, 981 F.3d at 870 (noting that when the nonmovant is the government, the third and fourth requirements of the preliminary injunction test may be consolidated).

As discussed in detail above, the challenged laws seriously infringe on the League's First Amendment rights and prevent the League from speaking freely, associating with others, and carrying out one of its main associational activities: registering more voters. And when the League "loses an opportunity to register a voter, the opportunity is gone forever." *Browning*, 863 F. Supp. 2d at 1167.

By contrast, neither Florida nor the public has any interest in enforcing unconstitutional laws. *See Otto*, 981 F.3d at 870; *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). Further, it is unlikely that an injunction "will cause any damage to the state at all" — defendants cannot show that the Law serves even an important interest or that the pre-SB 7050 regulatory regime has harmed or will harm the people of Florida or its elections. *Browning,* 863 F. Supp. 2d at 1167. Indeed, an injunction here will "keep the status quo for a merits decision," simply requiring officials to continue to enforce the law as it is now and will be at least until SB 7050's implementation date of July 1, 2023. *Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1290 (11th Cir. 2022) (quotation marks and citation omitted). Finally, without an injunction, "the amount of First Amendment-protected political speech and activity

will be reduced and the public will receive less information about" voter registration and "have fewer opportunities to associate with Plaintiffs in a meaningful way." *Cobb*, 447 F. Supp. 2d at 1340.

## CONCLUSION

For these reasons, the court should immediately enjoin enforcement of the four challenged provisions. Allowing the Law to take effect will severely and irreparably harm the League in violation of the First Amendment.

## LOCAL RULE 7.1(C) CERTIFICATE OF CONFERRAL

On June 12, 2023, counsel for Plaintiffs conferred with counsel for both Defendants. The Defendants oppose the Motion.

## LOCAL RULE 7.1(F) CERTIFICATE

This Memorandum contains 10,243 words and the Motion contains 183 words.

Dated: June 12, 2023                Respectfully submitted,

                                    /s/ Danielle Lang

Chad W. Dunn                        Danielle Lang (D.C. Bar No. 1500218)*
Florida Bar No. 0119137             Brent Ferguson (D.C. Bar No. 1782289)*
1200 Brickell Avenue,               Jonathan Diaz (D.C. Bar No. 1613558)*
Suite                               Ellen Boettcher (D.C. Bar No.90005525)*
1950                                Simone Leeper (D.C. Bar No. 1737977)*
Miami, FL 33131                     1101 14th Street NW, Ste. 400
Telephone: (305) 783-2190           Washington, DC 20005
Facsimile: (305) 783-2268           (202) 736-2200
chad@brazilanddunn.com              dlang@campaignlegalcenter.org
                                    jdiaz@campaignlegalcenter.org
                                    bferguson@campaignlegalcenter.org
                                    eboettcher@campaignlegalcenter.org
                                    sleeper@campaignlegalcenter.org

*Counsel for Plaintiffs*            *Admitted *pro hac vice*