**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

LEAGUE OF WOMEN VOTERS
OF FLORIDA, INC.; LEAGUE
OF WOMEN VOTERS OF
FLORIDA EDUCATION FUND

        Plaintiffs,

        v.

ASHLEY MOODY, in her official
capacity as Attorney General of
Florida, CORD BYRD, in his
official capacity as Florida
Secretary of State,

        Defendants.

Case No. 4:23-cv-00216
Chief Judge Mark E. Walker

**REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................iii

INTRODUCTION ................................................................................ 1

ARGUMENT ...................................................................................... 5

   I.   The Court Should Act Now to Grant Injunctive Relief................. 2

      A. The Challenged provisions of SB 7050 are subject to retroactive enforcement at defendants' discretion .............. 3

      B. Plaintiffs are already experiencing irreparable harm that should be alleviated now.................................................... 4

   II.   Abstention is Inappropriate ............................................................ 6

      A. *Buford* Abstention is exceptional and inapplicable .............. 6

      B. Rulemaking will not resolve SB 7050's constitutional violations.................................................................................. 8

   III.   Plaintiffs are Substantially Likely to Succeed on Their Claims Against the Challenged Laws ......................................................... 9

      A. The court must apply strict or exacting scrutiny ............... 9

      B. The challenged laws cannot survive strict or exacting scrutiny ................................................................................. 14

        1. The Volunteer Restrictions ............................................. 14

          a. Free speech, expressive conduct, and association .... 14

          b. Vagueness................................................................ 18

          c. Overbreadth ........................................................... 20

        2. The Voter Information Restriction ................................. 21

        3. The Receipt Requirement................................................ 23

   IV.   Plaintiffs Have Satisfied the Remaining Preliminary Injunction Factors................................................................................................ 26

CONCLUSION.................................................................................... 26

CERTIFICATE OF COMPLIANCE ................................................... 28

CERTIFICATE OF SERVICE ............................................................ 28

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page**

*Bernal v. Fainter*, 467 U.S. 216 (1984) ....................................................17

*Buckley v. Am. Constitutional Law Foundation*,

    525 U.S. 182 (1999) ......................................................................24, 25

*Carey v. Wisconsin Elections Commission*, 624 F. Supp. 3d 1020

    (W.D. Wis. 2022) ...........................................................................4,

*Deal v. Tugalo Gas Co., Inc.,* 991 F.3d 1313 (11th Cir. 2021) ..................7

*Edenfield v. Fane*, 507 U.S. 761 (1993) ...................................................16

*Estrada v. Becker*, 917 F.3d 1298 (11th Cir. 2019) .................................17

*Freenor v. Mayor & Alderman of City of Savannah*,

    474 F. Supp. 3d 1312 (S.D. Ga. 2019) ..............................................15

*Hallandale Professional Fire Fighters Local 2238 v. City of*

    *Hallandale*, 922 F.2d 756 (11th Cir. 1991) .........................................4,

*Harman v. Forssenius*, 380 U.S. 528 (1965)...............................................7

*In re Griffiths*, 413 U.S. 717 (1973) ..........................................................17

*Kuria v. Palisades Acquisition XVI, LLC*, 752 F. Supp. 2d 1293

    (N.D. Ga. 2010).................................................................................22

*League of Women Voters v. Hargett*, 400 F. Supp. 3d 706

    (M.D. Tenn. 2019) ..............................................................11, 13, 24

*League of Women Voters of Florida v. Browning*,

    575 F. Supp. 2d 1298 (S.D. Fla. 2008)..........................................13, 16

*League of Women Voters of Florida v. Cobb*,

    447 F. Supp. 2d 1314 (S.D. Fla. 2006).................................................11

*League of Women Voters of Florida, Inc. v. Detzner*, 354 F.
   Supp. 3d 1280 (N.D. Fla. 2018) ............................................................ 8

*McIntyre v. Ohio Elections Commission,* 514 U.S. 334 (1995) ......... 14, 23

*Meyer v. Grant*, 486 U.S. 414 (1988) ................................................ 10, 11

*Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020) ...................... 26

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) .......................................................... 6

*Quackenbush v. Allstate Insurance Co.*, 517 U.S. 706 (1996) .................. 7

*Siegel v. LePore*, 234 F.3d 1163 (11th Cir. 2000) .......................... 6, 7, 8, 9

*Sweet v. Sheahan*, 235 F.3d 80 (2d Cir. 2000) ......................................... 9

*Village of Schaumburg v. Citizens for a Better Environment*,
   444 U.S. 620 (1980) ................................................................................ 11

*Vital Pharmaceuticals, Inc. V. Alfieri*, 23 F.4th 1282
   (11th Cir. 2022) ....................................................................................... 26

*VoteAmerica v. Schwab*, No. CV 21-2253-KHV,
   2023 WL 3251009 (D. Kan. May 4, 2023) ......................................... 11

*Voting for America, Inc. v. Andrade*, 488 F. Appx. 890
   (5th Cir. 2012) ........................................................................................ 13

*Voting for America, Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013) ....... 12, 16

**Statutes**

Fla. Stat. § 97.0575(12) ................................................................................ 3

Fla. Stat. § 97.0575(1)(e) ........................................................................... 19

Fla. Stat. § 97.0575(1)(f) ............................................................................ 19

Fla. Stat. § 97.0575(5)(a) ........................................................................... 24

Fla. Stat. § 322.143(1)(a) ........................................................................... 22

**Other Authorities**

*Merriam-Webster's Online Dictionary*, https://www.merriam-webster.com/dictionary/personal (last visited June 25, 2023) ........... 22

Scalia & Garner, Reading Law 199-213 (2012) ...................................... 22

## INTRODUCTION

A preliminary injunction is appropriate in this case, and it should be entered immediately.

Defendants can point to no reason this Court should allow SB 7050 to take effect and begin harming the League's core voter registration activities. Although they claim the law will not be enforced for three more months, the League cannot be sure that violations of SB 7050 committed on July 1st will go unpunished. And even if defendants were correct, the League is suffering First Amendment harms now because it is already overhauling its voter registration program to comply with the law's requirements. Nor can the existence of a proposed rule — which would not solve the law's constitutional problems even if it were adopted — affect that conclusion.

Defendants' arguments on the law's constitutionality fare no better. While they urge this Court to accept their narrow readings of the challenged provisions, those readings find little support in the text. Moreover, defendants attempt to save the law by simply asking this Court not to apply the First Amendment; they scarcely attempt to enumerate the state's interests in enacting the challenged provisions or

explain how the laws are tailored to serve those interests. And while defendants make hay of a state report that discusses complaints about 3PVROs, that report contains largely unsubstantiated allegations and does not address the issues most important to this motion. On the questions at hand, defendants present no relevant evidence.

## ARGUMENT

### I.    The Court Should Act Now to Grant Injunctive Relief

There is no cause for the Court to delay in granting injunctive relief here. Defendants assert that the challenged provisions of SB 7050 do not take effect until September 30, 2023. But there is a significant risk that these restrictions could be applied retroactively, inflicting potentially ruinous financial penalties on Plaintiffs. Further, Plaintiffs are already experiencing irreparable harm due to the chilling effects of SB 7050's restrictions. Finally, because Plaintiffs' challenges will not be mooted by any rulemaking, delay will not eliminate the need for a preliminary injunction in short order.

A. <u>The challenged provisions of SB 7050 are subject to retroactive enforcement at defendants' discretion</u>

Based on the plain language of the statute, SB 7050 could be applied retroactively to any actions taken on or after July 1, 2023. The language regarding retroactivity in the statute is unclear at best:

> **The requirements of this section are retroactive** for any third-party voter registration organization registered with the department as of July 1, 2023 **on the effective date of this act**, and must be complied with within 90 days after the department provides notice to the third-party voter registration organization . . . .

Fla. Stat. § 97.0575(12) (emphasis added).

Defendants argue that this text means "[t]he provisions of Florida's election code that Plaintiffs challenge will not affect them until September 30, 2023." *See* Secretary of State's Response in Opposition to Motion for Preliminary Injunction ("Resp.") at 2. But this provides little assurance that the law will not be applied retroactively starting on September 30, 2023, such that any violations occurring before then will simply be punished later.

Even if defendants' brief can be construed as representing that the state will not enforce the law retroactively, Plaintiffs cannot rely on this assertion because defendants' litigation position is not binding. *See, e.g.*,

*Hallandale Pro. Fire Fighters Loc. 2238 v. City of Hallandale*, 922 F.2d 756, 762 (11th Cir. 1991) (pre-enforcement challenge allowed when "[a]ll that remained between the plaintiff and the impending harm was the defendant's discretionary decision—which could be changed—to withhold prosecution"); *Carey v. Wisconsin Elections Comm'n*, 624 F. Supp. 3d 1020, 1030 (W.D. Wis. 2022) ("[N]umerous courts have held that a litigation position doesn't eliminate a threat of enforcement because a litigation position isn't binding. . . .").

B. <u>Plaintiffs are already experiencing irreparable harm that should be alleviated now</u>

Even aside from their reasonable fear of retroactive penalties, the League is experiencing irreparable harm right now. Defendants argue that an injunction is "unnecessary to maintain the status quo" because of the alleged 90-day enforcement delay. *See* Resp. at 16. Yet defendants make no attempt to refute Plaintiffs' showing that harm is already occurring. *See id.* at 37. A 90-day window would not alleviate the harms that the League is facing, it would merely provide a slightly longer runway to implement the significant operational and substantive changes to its voter registration activity that are already underway.

Indeed, the League has already diverted significant effort, staff time, and resources from its other endeavors to plan and implement compliance measures. *See* Scoon Decl. ¶¶ 20, 33, 41. It has taken precious time from other programs to discuss compliance at the League's convention, which only occurs once a year. *See id.* ¶ 20. League members have already begun restructuring their voter registration training program, and the League will decertify all of its registration agents prior to July 1 so they can retrain to comply with SB 7050. *See id.* ¶¶ 19-21. The challenged provisions and retraining will discourage some volunteers from conducting voter registration. *See id.* ¶ 22. Each day that the League is not holding planned voter registration events or is working with fewer registration agents, its members are missing out on registering voters.

To avoid astronomical financial penalties, the League will have to violate its values to interrogate volunteers about their felony and citizenship status, and that questioning will need to start long before September 30. *See id.* ¶¶ 11-12, 23-25. Because of the risk of felony prosecution of its members, the League will at least temporarily stop collecting paper voter registration applications — as it has for years —

and instead will move to an online-only model that will be more costly and less effective. *See id.* ¶¶ 21, 33-34.

Further, a prompt decision on this matter will avoid any possible interference with election administration ahead of the 2024 elections. *See generally*, *Purcell v. Gonzalez*, 549 U.S. 1 (2006). And because the preliminary injunction motions have already been briefed and a hearing scheduled, a delay at this point would serve only to waste the time and resources of the Court and the parties.

## II.  Abstention is Inappropriate

### A. <u>*Burford* Abstention is exceptional and inapplicable</u>

The *Burford* abstention doctrine permits a federal court to dismiss a case: (1) "if it presents difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar," or (2) "if its adjudication in a federal forum would disrupt state efforts to establish a coherent policy . . . ." *Siegel v. LePore*, 234 F.3d 1163, 1173 (11th Cir. 2000). *Burford* abstention "represents an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy." *Id*. at 1173 (quotation marks and citation omitted). So extraordinary, in fact, that in the three cases

defendants cite, courts held that *Burford* abstention did not apply. *See Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 723 (1996); *Deal v. Tugalo Gas Co., Inc.,* 991 F.3d 1313, 1326 (11th Cir. 2021); *Siegel*, 234 F.3d at 1173. The last case defendants cite to support their argument, *Harman v. Forssenius*, exclusively discusses *Pullman* abstention. *See* 380 U.S. 528, 534 (1965).

A federal court should apply *Burford* "only when, by exercising its jurisdiction, [it] would *interfere* with an ongoing state administrative proceeding or action." *Tugalo Gas Co., Inc.,* 991 F.3d at 1326 (emphasis added). Here, injunctive relief would interfere with nothing; it would simply prevent the law from being enforced against Plaintiffs right now, as the rulemaking process continues uninterrupted. This Court would retain the ability to revisit its preliminary injunction ruling after the relevant rules are finalized.

Moreover, cases alleging First Amendment violations are especially inappropriate for abstention. *See Siegel*, 234 F.3d at 1174. *Id.* (citation omitted). Here, the First Amendment rights the League alleges are so important that this Court should not abstain from ruling on Plaintiffs' motion.

Abstention is even more inappropriate where delay could preclude resolution of the case before upcoming elections. *See League of Women Voters of Florida, Inc. v. Detzner*, 354 F. Supp. 3d 1280, 1284 (N.D. Fla. 2018) (citation omitted). The registration deadline for Florida's presidential preference primary election is on February 20, 2024 — and Plaintiffs certainly cannot begin registering voters on the last day before book closing with any hope of success. Delaying resolution of Plaintiffs' motion until after September 30 will likely push resolution of this case past the point at which relief could meaningfully preserve the League's First Amendment rights.

B. Rulemaking will not resolve SB 7050's constitutional violations

Although rulemaking may clarify the scope of certain issues, it would not cure SB 7050's constitutional defects — new rules would not be "dispositive of the case" before this Court, nor would they "materially alter the constitutional questions presented" by Plaintiffs' claims. *Siegel*, 234 F.3d at 1174. And even if the final rule were to obviate the need for injunctive relief with respect to some claims, this Court could always adjust or lift a preliminary injunction once a rule has issued.

Defendants further argue that this Court should rely on the *proposed* rules which, "[i]f adopted . . . will almost certainly moot various aspects of Plaintiffs' claims". Resp. at 13. However, these proposed rules have not, in fact, been adopted and have no legal weight. *See Sweet v. Sheahan*, 235 F.3d 80, 87 (2d Cir. 2000).

## III. Plaintiffs Are Substantially Likely to Succeed on Their Claims Against the Challenged Laws

A. <u>The court must apply strict or exacting scrutiny</u>

Defendants argue that the League's voter registration efforts constitute solely non-expressive conduct and that, at most, the challenged provisions should be reviewed under a relaxed version of the *Anderson-Burdick* test. Resp. at 24-28. Those arguments fall short.

Defendants first contend that "regulating who can collect and handle *completed* voter registration applications is a regulation of non-expressive conduct, not speech," claiming that disqualified volunteers retain some rights, such as discussing voter registration with potential applicants. *Id.* at 24-25.

Even if defendants' narrow interpretation of the Volunteer Restrictions were correct,[1] the fact that the challenged laws do not prohibit *all* speech and expressive conduct surrounding voter registration does not mean they escape rigorous scrutiny. As the Supreme Court explained in *Meyer v. Grant*, the availability of "other means to disseminate [a plaintiff's] ideas" does not decrease the constitutional protection for a chosen means of communication. 486 U.S. 414, 424 (1988). There, the Court determined that the law governing petition circulators prohibited the "most effective, fundamental, and perhaps economical avenue of political discourse," and the fact that "more burdensome avenues of communication" remained had no bearing on the First Amendment question. *Id.* (quotation marks and citation omitted).

Predictably, courts assessing voter registration laws have applied rigorous First Amendment scrutiny even when those laws regulate handling of voter registration applications and allow for other modes of First Amendment expression. In *League of Women Voters of Florida v. Cobb*, the court held that a deadline for 3PVROs to submit voter registration applications was analogous to the restrictions in *Meyer* and

---

[1] As discussed in Section III.B.1.b., *infra*, defendants' assurances that the statute's reach is narrow are unconvincing and insufficient.

that "the collection and submission of voter registration drives is intertwined with speech and association." 447 F. Supp. 2d 1314, 1332-34 (S.D. Fla. 2006); *see also Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980) (noting "the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech"); *VoteAmerica v. Schwab*, No. CV 21-2253-KHV, 2023 WL 3251009, at *13 (D. Kan. May 4, 2023) ("For constitutional purposes, the First Amendment does not countenance slicing and dicing plaintiff's actions."); *see also League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 721 (M.D. Tenn. 2019) (same).

That same analysis applies here. Even if the law allows for some speech, it will still lead to "speech diminution" and prevent the League from employing its chosen means of expression. *Meyer*, 486 U.S. at 421. For example, if disqualified volunteers were allowed to work at registration events without touching applications, the League would still have to undergo the burdensome process of investigating each of its volunteers statewide to learn their felony conviction and citizenship status, and it would still need to re-train each one on how to comply. It would then be required to identify disqualified volunteers at each drive,

and somehow ensure that an eligible volunteer was in the vicinity each time a disqualified volunteer approached a potential applicant. If an applicant attempted to hand the application to a disqualified volunteer, the volunteer would be forced to find another person to collect the application. This illustrates why disqualified volunteers' continued ability to "discuss politics" does not eliminate the laws' First Amendment problems.

Defendants' attempt to distinguish between voter registration and the petition process in *Meyer* and their heavy reliance on a divided Fifth Circuit panel opinion in *Voting for Am., Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013) are unconvincing. Resp. at 25-26. True, the *Steen* court upheld a provision that limited non-county-residents from working as state-sanctioned voter registration agents in Texas, but that decision rested in part on the plaintiffs' testimony that they "prefer[ed] to hire local people to handle the actual registrations" and used non-residents for more supervisory tasks, meaning that the provision created little burden. 732 F.3d at 392. Here, the League does rely on affected volunteers to provide registration services, and the challenged laws will not only prevent those volunteers from registering voters but will also chill others' speech.

Moreover, the *Steen* court's characterization of people assisting with voter registration as "agents of the state" and conclusion that voter registration activities could "be separated in a number of ways," *id.* at 389, 393, conflict with *Meyer* and the majority of courts reviewing similar laws.[2]

Further, defendants' discussion of the First Amendment standard is incomplete: they have nothing to say about how the First Amendment applies to the Voter Information Restriction and Receipt Requirement or why the laws should survive even though they are content- and viewpoint-based. But the League's interests in avoiding unnecessary exposure on state-required receipts, as well as in following up with applicants who are potential voters and members, trigger the same scrutiny applied in *Meyer. See Hargett,* 400 F. Supp. 3d at 726; *see also McIntyre v. Ohio Elections Commission,* 514 U.S. 334, 348-49 (1995). And as with the Volunteer Restrictions, those two provisions will lead to less speech and association — League members will be able to contact and

---

[2] Defendants also rely on *Voting for Am., Inc. v. Andrade*, 488 F. Appx. 890 (5th Cir. 2012), and *League of Women Voters of Florida v. Browning*, 575 F. Supp. 2d 1298 (S.D. Fla. 2008). But *Browning* involved a deadline for returning registration applications, which is not an issue raised by this motion. 575 F. Supp. 2d at 1305. Further, the *Browning* court's decision involved voluminous testimony supporting the state's interests. *Id.* at 1324. And *Andrade* adds little because it was an earlier opinion in the same case as *Steen.*

speak to fewer people, and fewer members will volunteer because of their concerns about felony prosecution.

B. <u>The challenged laws cannot survive strict or exacting scrutiny</u>

*1. The Volunteer Restrictions*

a. Free speech, expressive conduct, and association

Defendants make almost no attempt to justify the Volunteer Restrictions, relying instead on the refrain that voter registration activity is non-expressive conduct. For that reason, they have failed to show that the provisions pass any level of First Amendment scrutiny.

In support of the Felony Volunteer Restriction, defendants name a laundry list of post-hoc state interests, including "ensuring that all voter registration applications are properly and timely submitted," "preventing voter fraud, and "holding [3PVROs] accountable." Resp. at 27 (quotation marks and citations omitted).

That cursory justification is unpersuasive. First, some of the state's claimed interests have no clear relation to the law. For example, defendants do not explain why allowing people with certain felony convictions, but not others, to participate in voter registration drives would threaten the state's interest in timely submission of applications or "holding [3PVROs] accountable." *Id.* at 27.

14

Defendants have failed to even hint at how other state interests are served by the law, saying only that "[k]eeping convicted felons from handling personal voter information . . . furthers these interests." Resp. at 28. But the First Amendment forbids the broad conclusion that a person convicted of a felony is likely to facilitate voter fraud. Plaintiffs' Brief ("Pl. Br.") at 32-33. *See Freenor v. Mayor & Alderman of City of Savannah*, 474 F. Supp. 3d 1312 (S.D. Ga. 2019) (requirement that tour guides pass a criminal background check was not narrowly tailored to further city's interest).

Nor have defendants shown that the Felony Volunteer Restriction is reasonably tailored to serve any interest. For example, they fail to explain why it was necessary to include the myriad disqualifying felonies in the law, such as those involving the statutory cap on payments for initial debt management consultations or for unlawfully subleasing a car. *See* Pl. Br. at 33. Further, Defendants have provided no reason why the law must impose a $50,000 strict liability penalty on 3PVROs or why existing laws to fight malfeasance are insufficient to serve the interests they assert. *See* Pl. Br. at 34.

15

Defendants have also pointed to no *evidence* that the Felony Volunteer Restriction is needed, flatly asserting that it "isn't necessary." Resp. at 28.   But as explained above, that evidence is unequivocally necessary because of the First Amendment harms the law creates. *See Edenfield v. Fane*, 507 U.S. 761, 771 (1993). And even in the few cases defendants incorrectly rely upon to argue that their burden is low, the government still made some evidentiary showing. *See Steen*, 732 F.3d at 394 (citing defendant's "documented evidence of voter registration fraud by canvassers"); *Browning*, 575 F. Supp. 2d at 1324 (citing deposition testimony supporting claim that 3PVROs failed to timely submit applications).

Defendants offer little additional reason to uphold the Non-U.S. Citizen Volunteer Restriction, devoting less than two pages to their defense of the law and simply claiming that the state "has strong and compelling interests in safeguarding election integrity, preventing voter fraud, and promoting confidence in the election system as a whole." Resp. at 29. But defendants do not explain why this list of state interests differs from those that support the Felony Volunteer Restriction, and in any

event, their cursory assertions cannot bear the weight of any level of scrutiny.

First, defendants have made no attempt to show that preventing non-citizens from helping with voter registration will serve their stated interests. And courts have frequently found that non-citizens are fit to perform the same functions as citizens and may not be prevented from doing so. *See In re Griffiths*, 413 U.S. 717, 724 (1973).[3]

Nor have defendants shown that the law is well-tailored or supported by evidence. Tellingly, they fail to acknowledge that the provision treats legal permanent residents the same as those in the United States without permission, *see* Resp. at 29-30, serving to demonstrate its plain unconstitutionality, *see* Pl. Br. at 30. *See Estrada v. Becker*, 917 F.3d 1298, 1309 (11th Cir. 2019). And as with the Felony Volunteer Restriction, defendants do not attempt to justify its $50,000 strict liability penalty or explain why the existence of other state laws that serve to combat voter fraud are insufficient to serve the state's interests. *See* Pl. Br. at 31-32. And of course, defendants have introduced

---

[3] Defendants note that non-citizens are not allowed to vote, serve on a jury, or hold public office. Resp. at 30. But those public functions are exceptions, and many cases confirm non-citizens' constitutional rights to perform the same jobs and functions citizens do. *See, e.g.*, *Bernal v. Fainter*, 467 U.S. 216, 220 (1984).

no evidence that non-citizens, whether legal residents or not, have contributed to voter fraud or other malfeasance while working as 3PVRO volunteers.

### b. Vagueness

Defendants also maintain that the Volunteer Restrictions are not vague and that the phrase "collecting and handling" is easily understandable. Resp. at 18-21. But while the Secretary's rule might eventually narrow the scope of the law, such a narrow reading is not apparent from the words now codified.

First, defendants contend that because the word "handle" ordinarily means "to manage with the hands," the law is clear that a disqualified volunteer may engage in any activity that does not involve "physical custody" of applications. Resp. at 19. But the words "physical custody" appear nowhere in SB 7050; they are simply defendants' attempt to artificially narrow the law for the purposes of litigation, and they do not clearly cover the same actions that "handling" would. For example, according to defendants, such physical custody obviously includes "a 3PVRO volunteer with a stack full of completed applications in his car." *Id.* at 20. Yet, a volunteer driving a car with completed

applications need not have managed applications with their hands, especially, as is often the case, if there is more than one person participating in a voter registration drive — coverage of that activity depends on the additional "physical custody" requirement manufactured by defendants.

Likewise, defendants claim that the law does not apply to *blank* voter registration forms, meaning that disqualified volunteers could distribute forms but not collect them. *Id.* at 20, 24-25. But that limitation appears nowhere in the statute — the law forbids "handling voter registration applications on behalf of a" 3PVRO at any time. Fla. Stat. § 97.0575(1)(e), (f). Of course, a reasonable person would believe that a volunteer who is handing out blank forms at a League event was "handling" those forms on behalf of the League.

Further, defendants rely on the law's "context" to argue that the word "handle" does not mean "supervising or directing," noting that the legislature could have included the words "supervising or directing" if it had wished to broaden the statute. *Id.* at 20-21. But there can be no dispute that the word "handle" is often used to mean "supervise" — a League volunteer may "handle" the voter registration applications for her

local chapter. And just as the legislature could have used the word "supervise," it could have used the phrase "physical custody" that defendants rely on here.[4] It did not.

### c. Overbreadth

Defendants also fail to muster any sufficient response to Plaintiffs' argument that the Volunteer Restrictions are overbroad. *See* Resp. at 23, 29. As noted, defendants cannot plausibly argue that the state has a sufficient interest in disqualifying non-U.S. citizens who are law-abiding legal residents from assisting with voter registration. Similarly, they can provide no justification for disqualifying people with decades-old felony convictions for crimes that have no conceivable relationship to voter fraud or election integrity from participating in voter registration activity. Pl. Br. at 39-40. And that overbreadth problem is only exacerbated by the law's astronomical penalties, which are imposed on a strict liability basis.

---

[4] Defendants also maintain that the Felon Volunteer Restriction is not vague because it lists the felony statutes in question and assert that it is inconsequential whether a person has been pardoned or had their voting rights restored. Resp. at 21. Yet that argument is undercut by their later explanation that "the Secretary reads the statutory prohibition to apply" to those convicted under federal law or out of state, despite the fact that such inclusion is nowhere referenced in SB 7050. Resp. at 22 n.7.

## 2. The Voter Information Restriction

Defendants defend the Voter Information Restriction without explaining what interests it serves, arguing only that it prevents 3PVROs from retaining an applicant's "personal, *sensitive* information," like a social security number, but not a voter's name, address, or contact information. Resp. at 33.

Of course, by relying only on their own narrowing construction of the statute, defendants implicitly concede that the law could not stand if it were to prevent 3PVROs from retaining an applicant's name and contact information. That makes good sense: the law severely burdens the League's rights by preventing volunteers from contacting potential voters and potential members. Read plainly, this restriction prevents and punishes retention of information far beyond any conceivable state interest in protecting against fraudulent practices.

Defendants' post hoc attempt to rewrite the phrase "personal information" to read "'private', non-public" information or "personal, sensitive information" does not hold water. Resp. at 31, 33. While they assert that the law is clear because "personal" can mean "private," *id.* at 31, they fail to acknowledge that the term "personal" is often used to

21

simply mean "of, relating to, or affecting a particular person."[5] And that is how the term is used elsewhere in Florida law. Fla. Stat. § 322.143(1)(a) ("'Personal information' means an individual's name, address . . . ."). At bottom, as defendants point out elsewhere, the legislature uses the words that it wants, and it chose to prohibit the retention of *all* personal information, not only information that is "private" or "sensitive."

The fact that the statute provides some examples of "personal information" makes it no less vague — the scope of a general term followed by a list of specifics is not limited by that list. *See* Scalia & Garner, READING LAW 199-213 (2012) (explaining *ejusdem generis* canon); *see also Kuria v. Palisades Acquisition XVI, LLC*, 752 F. Supp. 2d 1293, 1303 n.11 (N.D. Ga. 2010) (discussing vagueness of federal statute that included list of examples).

Finally, even if defendants' cramped reading of the statute were correct, it would not fully solve the law's First Amendment problem. SB 7050 makes it a third-degree felony for a volunteer to retain a voter's information for any reason other than to provide it to a 3PVRO. Thus, if

---

[5] *Merriam-Webster's Online Dictionary*, https://www.merriam-webster.com/dictionary/personal (last visited June 25, 2023).

a League member photocopied an application for recordkeeping purposes or unintentionally retained other information, she could be charged with a felony. Thus, the chilling effect on League members would not be solved by the state's interpretation of the law.

### 3. The Receipt Requirement

Defendants argue that the Receipt Requirement, including the provision requiring volunteers to disclose their full names, serves the state's "important interest[] in ensuring that 3PVROs are held accountable for the delivery of completed voter registration applications." Resp. at 35. Yet that interest does not correspond to or justify the burden the law creates.

First, defendants assert that it is "[i]ronic[]" for the League to argue that the First Amendment requires that 3PVROs be allowed to collect applicants' contact information but forbids the state from requiring disclosure of volunteer information. Resp. at 34-35. But there is nothing ironic about what the First Amendment requires — it makes different demands of the government than it does of the people. It is not novel to point out that just as the government may not force disclosure of certain private information, *see McIntyre,* 514 U.S. 334, it also may not prevent

23

regular people from seeking information, *see Hargett*, 400 F. Supp. 3d at 726.

This helps explain why the Receipt Requirement is not well-tailored to help ensure that 3PVROs deliver completed registration forms. Each 3PVRO application has a special identification number, and SB 7050 requires the 3PVRO's name to be listed on each receipt as well. Thus, applicants will have sufficient means to track applications if they so wish; defendants suggest no specific use applicants can make of a volunteer's full name.[6] Nor have they  put forth any evidence to show that purported failures by 3PVROs could somehow be avoided if applicants had the name of a specific volunteer. And that is unsurprising, because even if 3PVROs did frequently mishandle ballot applications, which defendants have not established, those problems would often stem from people delivering or reviewing applications, not people collecting them.

Defendants also attempt to distinguish this case from *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182 (1999), arguing that here, "there's a separation from the moment the volunteers speak and when

---

[6] Importantly, the law levies fines on the 3PVRO, not the individual volunteer, if a registration form is submitted late. Fla. Stat. § 97.0575(5)(a).

the volunteers provide their names." Resp. at 36. But defendants again miss that voter registration is not just a physical activity — while a receipt may be provided after an application is complete, that does not mean the League volunteer is finished speaking with an applicant about political issues or potential membership.

Further, while defendants point out that the *Buckley* Court assumed that a "requirement that signature collectors provide their names, addresses, and signatures on affidavits" was permissible, Resp. at 36, the affidavits required in *Buckley* were forms submitted to the government that later became public records; unlike here, they were not given to any person completing a voter registration application or signing a petition, 525 U.S. at 198. Moreover, the *Buckley* Court also invalidated a requirement that the names of paid petition circulators be publicly disclosed, explaining that "[t]he added benefit of revealing the names" of the speakers in question was "hardly apparent and has not been demonstrated." *Id*. at 203.

## IV. Plaintiffs Have Satisfied the Remaining Preliminary Injunction Factors

As Plaintiffs have previously explained, they will be irreparably harmed absent an injunction. *See* Section I, *supra*. And neither

defendants nor the public have any interest in the enforcement of unconstitutional laws. Pl. Br. at 51-52; *see Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020). And when "Defendants have not demonstrated that the Law is necessary to further their asserted interests and . . . Plaintiffs have important First Amendment freedoms at stake, the balance of interests clearly favors injunctive relief." *Cobb*, 447 F.Supp.2d at 1340. Plaintiffs' requested injunctive relief would "keep the status quo for a merits decision," *Vital Pharms., Inc. V. Alfieri*, 23 F.4th 1282, 1290 (11th Cir. 2022)*,* merely requiring officials to continue enforcing the law as it stands now, before SB 7050 goes into effect, until this Court makes a final determination.

## CONCLUSION

For these reasons, the Court should grant preliminary injunctive relief.

26

Dated: June 26, 2023      Respectfully submitted,

/s/ Brent Ferguson

Chad W. Dunn           Danielle Lang (D.C. Bar No. 1500218)*
Florida Bar No. 0119137   Brent Ferguson (D.C. Bar No. 1782289)*
1200 Brickell Avenue,     Jonathan Diaz (D.C. Bar No. 1613558)*
Suite 1950             Ellen Boettcher (D.C. Bar No.
Miami, FL 33131         90005525)*
Telephone: (305) 783-2190  Allison Walter (D.C. Bar No. 90008637)*
Facsimile: (305) 783-2268   Simone Leeper (FL Bar No. 1020511)*
chad@brazilanddunn.com    1101 14th Street NW, Ste. 400
Washington, DC 20005
(202) 736-2200
dlang@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
jdiaz@campaignlegalcenter.org
eboettcher@campaignlegalcenter.org
awalter@campaignlegalcenter.org
sleeper@campaignlegalcenter.org

*Counsel for Plaintiffs*      *Admitted pro hac vice

27

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULES

Pursuant to Local Rule 7.1(F), this brief contains 4,990 words excluding the case style, signature block, and any certificate of service.

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2023, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

/s/ Brent Ferguson
Brent Ferguson

28