# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

LEAGUE OF WOMEN VOTERS OF FLORIDA, INC.; LEAGUE OF WOMEN VOTERS OF FLORIDA EDUCATION FUND,

     *Plaintiffs,*

               v.

ASHLEY MOODY, in her official capacity as Attorney General of Florida, CORD BYRD, in his official capacity as Florida Secretary of State,

     *Defendants.*

Case No. 4:23-cv-00216

## LEAGUE OF WOMEN VOTERS OF FLORIDA'S OPPOSITION TO THE SECRETARY OF STATE'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..............................................................iii

INTRODUCTION ..........................................................................1

STATEMENT OF FACTS.............................................................2

LEGAL STANDARD.....................................................................5

ARGUMENT .................................................................................6

   I.  LWVFL Has Standing to Challenge the Felony Volunteer Restriction...............................................................................6

      A. LWVLF has organizational standing.......................7

         1.  The Restriction directly injures LWVFL .........7

         2.  LWVFL has diverted resources and will continue to do so ..................................................13

      B. LWVFL has associational standing ........................16

      C. The other standing requirements are satisfied.......19

   II. Summary Judgment Is Inappropriate on LWVFL's Freedom of Speech and Association Claims .........................20

      A. The record supports the conclusion that strict scrutiny applies and that the law cannot satisfy any level of scrutiny....................................................20

         1. The First Amendment protects LWVFL's voter registration activity ..................................20

         2. The Court should apply strict or exacting scrutiny ............................................................24

         3. The Restriction cannot survive any heightened scrutiny ...........................................26

      B. Summary judgment is premature because material facts remain in dispute .................................31

   III. The Secretary Is Not Entitled to Summary Judgment on LWVFL's Vagueness Claim .............................................33

      A. The Restriction is vague because it fails to define which felonies are covered .........................................34

i

B. The Restriction is vague because the term "collecting and handling" fails to clearly define what activities are prohibited.......................36

C. Summary judgment is inappropriate because the record is incomplete ......................................39

IV. Summary Judgment Is Not Warranted on LWVFL's Overbreadth Claim...............................40

CONCLUSION...............................................................43

CERTIFICATE OF COMPLIANCE ............................45

CERTIFICATE OF SERVICE .....................................45

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page**

*American-Arab Anti-Discrimination Committee v. City of
    Dearborn*, 418 F.3d 600 (6th Cir. 2005) ....................................31

*Americans for Prosperity Foundation v. Bonta*,
    141 S. Ct. 2373 (2021) ................................................................7

*Arcia v. Florida Secretary of State*, 772 F.3d 1335
    (11th Cir. 2014) ...................................................................13, 18

*Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) ...............11, 26

*Buckley v. American Constitutional Law Foundation, Inc.*,
    525 U.S. 182 (1999) ................................................. 22, 24, 25, 26

*Burns v. Town of Palm Beach*, 999 F.3d 1317
    (11th Cir. 2021) ........................................................................33

*Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231
    (11th Cir. 2022). .........................................................................6

*Common Cause/Georgia v. Billups*, 554 F.3d 1340
    (11th Cir. 2009) ........................................................................13

*Curling v. Raffensperger*, 50 F.4th 1114 (11th Cir. 2022)............31

*Dream Defenders v. Governor of the State of Florida*,
    57 F.4th 879 (11th Cir. 2023) ........................... 16, 17, 33, 34, 41

*Dunn v. Blumstein*, 405 U.S. 330 (1972) ......................................30

*Florida State Conference of the National Association for the
    Advancement of Colored People v. Browning*, 522 F.3d 1153
    (11th Cir. 2008) .................................................................15, 17

*Florida State Conference of Branches and Youth Units of the
    NAACP v. Byrd*, 2023 WL 4311084
    (N.D. Fla. July 3, 2023) ................................................7, 8, 10, 19

iii

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
901 F.3d 1235 (11th Cir. 2018)...................................................21

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
11 F.4th 1266 (11th Cir. 2021) ............................... 6, 8, 9, 16, 19

*Harrell v. The Florida Bar*, 608 F.3d 1241 (11th Cir. 2010) ........10

*Jacobson v. Florida Secretary of State*, 974 F.3d 1236
(11th Cir. 2020) ..........................................................................7

*Johnson v. City of Cincinnati*, 310 F.3d 484 (6th Cir. 2002).........29

*League of Women Voters v. Hargett*, 400 F. Supp. 3d 706
(M.D. Tenn. 2019)..................................................... 20, 22, 23, 24

*League of Women Voters of Florida v. Cobb*,
447 F. Supp. 2d 1314 (S.D. Fla. 2006)............................ 8, 20, 32

*League of Women Voters of Florida v. Browning*,
575 F. Supp. 2d 1298 (S.D. Fla. 2008)................................20, 22

*League of Women Voters of Florida v. Browning*,
863 F. Supp. 2d 1155 (N.D. Fla. 2012) ...............................20, 26

*League of Women Voters of Florida, Inc. v. Lee*,
576 F. Supp. 3d 1004 (N.D. Fla. 2021).........................32, 39, 40

*League of Women Voters of Florida, Inc. v. Lee*,
595 F. Supp. 3d 1042 (N.D. Fla. 2022) ..............................33, 40

*League of Women Voters of Florida, Inc. v. Florida Secretary of State*, 66 F.4th 905 (11th Cir. 2023)..........................................33

*Meyer v. Grant*, 486 U.S. 414 (1988)............................ 20, 22, 23, 24

*Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018) ......25

*National Association for the Advancement of Colored People v.
Button*, 371 U.S. 415 (1963) ....................................................26

*Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009).........7

iv

*Priorities USA v. Nessel*, 462 F. Supp. 3d 792
(E.D. Mich. 2020)..............................................................24

*Project Vote v. Blackwell*, 455 F. Supp. 2d 694
(N.D. Ohio 2006)..............................................................22

*Reed v. Town of Gilbert, Arizona*, 576 U.S. 155 (2015) ................25

*SisterSong Women of Color Reproductive Justice Collective v.
Governor of Georgia*, 40 F.4th 1320 (11th Cir. 2022)...............33

*Speech First, Inc. v. Cartwright*, 32 F.4th 1110
(11th Cir. 2022) ......................................................... 7, 25

*United States v. Kelly*, 625 F.3d 516 (8th Cir. 2010) ....................41

*United States v. Salerno*, 481 U.S. 739 (1987).............................6

*VoteAmerica v. Raffensberger*, 609 F. Supp. 3d 1341
(N.D. Ga. 2022)..............................................................12

*VoteAmerica v. Schwab*, 2023 WL 3251009
(D. Kan. May 4, 2023).................................................22, 24

## Other Authorities        Page

Fed. R. Civ. P 56(a) ...........................................................5

Fla. Admin. Code 1S-2.042(3)(c) .....................................8, 38

Fla. Stat. § 97.012(1)-(2) ..................................................19

Fla. Stat. § 97.0575(1)(e).....................................................1

Fla. Stat. § 97.0575(1)(f) ...................................................38

Fla. Stat. § 97.0575(8) ......................................................19

Fla. Stat. § 817.5621 ........................................................29

Fla. Stat. § 817.802(1) ......................................................29

Fla. Stat. § 817.806(2)........................................................29

Internal Revenue Code § 501(c)(3)....................................................6

Internal Revenue Code § 501(c)(4)....................................................6

Handle Definition & Meaning - Merriam-Webster.
    https://www.merriam-webster.com/dictionary/handle .............37

## INTRODUCTION

Florida enacted the Felony Volunteer Restriction, Fla. Stat. § 97.0575(1)(e), last year as part of an omnibus bill restricting the speech and conduct of organizations that help people register to vote. Plaintiff League of Women Voters of Florida ("LWVFL") immediately challenged the Restriction on First Amendment and vagueness grounds. Because of the Restriction's $50,000 fine provision, LWVFL has been forced to cease its normal voter registration drives and replace them with less effective online-registration assistance.

Secretary of State Cord Byrd now moves for summary judgment, arguing that LWVFL lacks standing and that this Court can decide the case's merits on the current record. But summary judgment is inappropriate here, where myriad factual disputes remain. LWVFL disputes the facts the Secretary proffers to support his claim that the Restriction serves the state's interests. The Secretary tries to justify the law based on a handful of anecdotes, largely involving a single outlier 3PVRO, and presents no evidence that the Restriction would address even the few problems he identifies.

Moreover, LWVFL has introduced evidence showing that the Restriction has led it to register fewer voters, engage in less First Amendment activity, and divert resources away from its organizational priorities. It has submitted evidence that the Restriction curtails LWVFL's free speech, expressive conduct, and right to associate, which the Secretary disputes. These factual disagreements preclude summary judgment.

## STATEMENT OF FACTS

LWVFL's registration drives are community-driven events where volunteers encourage their neighbors to vote. At a typical drive, LWVFL sets up a registration table, and volunteers with voter-registration applications walk around and encourage people to register. ECF 93-1, Scoon Decl. ¶16-22; ECF 93-2, Chandler Decl., ¶25. These drives move fluidly: one volunteer may help someone complete their application form while another talks to someone else. The volunteers often check each other's forms, handing them back and forth. Afterwards, the volunteers return to the table and drop off completed forms, which a member delivers to the Supervisor of Elections.

LWVFL disputes that "3PVROs have behaved badly in Florida." Secretary's Memorandum in Support of Summary Judgment, ECF 87 ("Mem.") at 2. Rather, 3PVROs perform invaluable work: from 2018-2022, they helped register 272,719 new voters.[1] The Secretary focuses on one 3PVRO that may have acted improperly, but the vast majority of 3PVROs operate in good faith.

The Secretary also highlights the proportionally small number of late-returned applications submitted by 3PVROs. *See* Mem. at 4. It is undisputed that 3PVROs should comply with statutory deadlines. But late applications are processed if they are received before the book-closing deadline. ECF 93-5, Morley Dep. 65:3-66:1. Thus, applications delivered after the statutory deadline but prior to book closing usually do not "caus[e] harm" to voters. Mem. at 4. LWVFL, for instance, has submitted many tens of thousands of registration applications since registering as a 3PVRO. 3PVROs Voter Registration Data, ECF 27-6. In that time, the

---

[1] Pre-2018 data does not isolate 3PVRO registrations, ECF 93-4 Voter Registration – Method and Location Data, at 3, but shows that 3PVROs have submitted nearly 2.5 million applications. 3PVROs Voter Registration Data, ECF 27-06.

League is aware of three instances of untimely applications, resulting from good-faith errors in calculating deadlines and from delays due to Hurricane Dolan. ECF 93-6, LWVFL Obj. and Resp. to Sec'ys 1st ROGs at 19. None of those short delays prevented a voter's registration.

Against this backdrop, Florida targeted 3PVROs with restrictions carrying draconian financial penalties, among them the Felony Volunteer Restriction. The Restriction fines 3PVROs $50,000 for each volunteer who collects or handles voter registration applications if that volunteer has a felony conviction listed in the statute, although the Secretary has said the list is not exhaustive. The Secretary has provided atextual and inconsistent answers about what the statute covers, meaning LWVFL cannot be certain who the Restriction excludes or what conduct it prohibits, risking onerous fines. ECF 93-1, Scoon Decl., ¶¶11-12, 25; ECF 93-2, Chandler Decl., ¶28-29.

Because of this risk and because conditioning participation in its activities on background checks is contrary to its associational values, LWVFL is no longer collecting paper applications, diverting its resources to less effective "online-only" registration drives. ECF 93-1, Scoon Decl., ¶22–24. Online drives are costlier, slower, and far less effective in

4

advancing the League's mission. *Id*. Rather than free, state-issued applications, such drives require mobile devices and WiFi hotspots, which the League and its local chapters cannot readily afford. ECF 93-1, Scoon Decl. ¶33; ECF 93-7, July Emails with T-Mobile.

The Restriction has led LWVFL and other 3PVROs to register fewer voters. In 2023, 3PVROs assisted only 5,058 new voters, about 10% of the average in previous years. ECF 93-4, Voter Registration – Method and Location. The month the Restriction went into effect, the Division of Elections reported the fewest applications received from 3PVROs since the height of the COVID-19 pandemic.[2] ECF 93-9, 2021 Voter Application Data.

## LEGAL STANDARD

Summary judgment is appropriate only when the movant "shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P 56(a). Courts must "draw all reasonable inferences in the light most

---

[2] To date, the Secretary has produced just one month of 3PVRO data since SB7050 went into effect. ECF 93-8, 2023 Voter Application Data.

favorable to . . . the non-moving parties." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1291 (11th Cir. 2021).

Contrary to the Secretary's argument, *United States v. Salerno*, 481 U.S. 739 (1987), does not alter this Court's analysis. *See, e.g., Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022).

**ARGUMENT**

## I.  LWVFL Has Standing to Challenge the Felony Volunteer Restriction

LWVFL has both organizational and associational standing to challenge the Restriction.[3] The restriction injures LWVFL and its members by directly harming the organization's mission, infringing on their constitutional rights, and forcing LWVFL to divert resources from other projects.

---

[3] In this Part, "LWVFL" refers to the LWVFL Education Fund, organized under Internal Revenue Code § 501(c)(3), which conducts the organization's voter-registration activities. ECF 93-10, Scoon Dep. 7:2-25, 31:3-32:7. LWVFL Inc., organized under § 501(c)(4), advocated against the Restriction. ECF 93-1, Scoon Decl., ¶30. Though this Part focuses on the Education Fund's standing, LWVFL, Inc. also has standing to challenge the Restriction, as explained below.

A. <u>LWVFL has organizational standing</u>

"[O]rganizational standing can take many forms." Order Denying Prelim. Inj., ECF 46 at 16, n.5. An organization may "demonstrate[ ] a direct injury" if a law prevents it from achieving its mission or makes it harder to attract members, raise funds, or fulfill its purpose. *Fla. State Conf. of Branches & Youth Units of the NAACP v. Byrd*, 2023 WL 4311084, at \*9 (N.D. Fla. July 3, 2023); *see also Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373, 2380 (2021); *Pleasant Grove v. Summum*, 555 U.S. 460 (2009). Constitutional harms also confer standing. *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1119 (11th Cir. 2022). Separately, necessary diversions of resources that impair an organization's "ability to engage in its projects" demonstrate organizational standing. *Jacobson v. Florida Sec'y of State*, 974 F.3d 1236, 1250 (11th Cir. 2020) (quotation marks omitted).

1. *The Restriction directly injures LWVFL*

First, by compelling LWVFL to stop its paper voter-registration drives to avoid liability, the Restriction "directly impedes" LWVFL's mission by drastically reducing how many people it can help register. *Fla.*

*NAACP*, 2023 WL 4311084, at *10;[4] *see also League of Women Voters v. Cobb*, 447 F. Supp. 2d 1314, 1325, 1339 (S.D. Fla. 2006) (finding irreparable injury after law forced the League to "impose[] a moratorium on voter registration"). LWVFL's online-only drives are more costly, slower, and far less effective in advancing LWVFL's mission. ECF 93-1, Scoon Decl., ¶23. Helping voters register online takes more time and resources than does collecting a paper application. Volunteers engage with fewer people per event and conduct fewer drives overall, in part because they lack funding for the technology such drives require. *Id*. The inability to collect forms has also made it difficult for LWVFL to quantify how many voters it assists statewide, impairing its ability to demonstrate its effectiveness when applying for grants, limiting LWVFL's overall work. *Id*.

Second, the Restriction directly harms LWVFL by curtailing its principal means of engaging in free speech and expressive conduct. *See*

---

[4] Based on the Secretary's representation, the League understands that, at least for now, it will not be fined for violating the Restriction if it only assists voters registering online or encourages voters to mail in their own registration forms. *See*, *e.g.*, Fla. Admin. Code 1S-2.042(3)(c).

*Ft. Lauderdale Food Not Bombs*, 11 F.4th at 1286. LWVFL demonstrates its trustworthiness and commitment to civic participation by collecting paper applications, and recruiting volunteers regardless of criminal history is vital to LWVFL's community outreach and education efforts. ECF 93-1, Scoon Decl., ¶¶7-9, 13-15. Under the Restriction, LWVFL cannot do both; it must choose one or the other. By forcing LWVFL to abandon its 3PVRO activities, the Restriction deprives it of one of its "chief means of advocacy." *Ft. Lauderdale Food Not Bombs*, 11 F.4th at 1287.

Far from an "excessive" reaction, Mem. at 10, ceasing paper voter-registration drives is essential to LWVFL's survival. The Restriction allows the Secretary to impose a $50,000 fine for any violation. As explained in Part III, *infra*, LWVFL cannot know *which* felony convictions exclude would-be volunteers, nor is it sure exactly which activities are banned. And the Secretary's assurances that a "3PVRO

won't be fined" if *all* volunteers sign a "Non-Felon Declaration," Mem. at 21, ring hollow.[5]

LWVFL cannot afford to be wrong. One $50,000 fine would hobble LWVFL; five or six would wipe out its entire annual budget. ECF 93-1, Scoon Decl., ¶4. And because it has thousands of members and works often in communities with volunteers who were formerly incarcerated, ECF 93-1, Scoon Decl., ¶12, LWVFL is likely to violate the Restriction if it resumes collecting paper applications. Contrary to the Secretary's argument, "the law generally will not force a choice between speech and sanction." *Harrell v. The Florida Bar*, 608 F.3d 1241, 1261 (11th Cir. 2010).

_____

[5] First, the Secretary's representative testified that a 3PVRO could be fined if a volunteer signs the Non-Felon Declaration but has been convicted of an out-of-state or federal crime "comparable" to a disqualifying crime, despite no mention of non-Florida convictions on the Declaration. *See* ECF 93-11, Darlington Dep., 272:4-275:22. Further, the Declaration would not absolve the League of liability if it collaborated on a voter registration drive with another organization whose members were disqualified. Finally, because "[r]ewriting state statutes is the sole province of the state's legislative branch," *Fla. NAACP*, 2023 WL 4311084 at *17, the rule cannot remedy the Restriction's constitutional defects or prevent strict-liability enforcement.

Even if LWVFL could resume paper registration activities, the Restriction would cause direct harm. First, LWVFL could only do so if it begins conducting background checks as part of its membership process and excluding certain members from its activities. The State does not deny this. A clearer  infringement the right to expressive association is hard to imagine. *See Boy Scouts of America v. Dale*, 530 U.S. 640, 647 (2000). But for the Restriction, LWVFL would invite those involved in its Reinstatement of Voting Rights Program to assist with registering voters this year. *See* ECF 93-12, Williams Decl., ¶¶15-16. Dozens of these people have out-of-state and federal convictions; LWVFL has *no* way of knowing whether they are covered by the Restriction.[6] ECF 93-12, Williams Decl., ¶18. Resuming paper drives would force LWVFL to treat those with convictions differently than other volunteers, preventing LWVFL from promoting its values "both expressly and by example." *Dale*, 530 U.S. at 650.

Second, under the Restriction, paper registration drives would result in fewer voter registrations for several reasons: LWVFL would be

---

[6] *See* Part III.A., *infra*.

unable to work with people who have convictions, reducing the number of volunteers and the number of events LWVFL could hold. ECF 93-1, Scoon Decl., ¶29; ECF 93-12, Williams Decl., ¶21. If LWVFL were to require each volunteer to sign the Non-Felon Declaration, fewer would participate: some would refuse, some would attempt to participate in drives unaware of the Declaration requirement, and some would be unable to sign because they would not know if a past conviction was covered. ECF 93-1, Scoon Decl., ¶29.

Moreover, the Restriction would compel LWVFL's speech and force its association with the State's viewpoint. LWVFL disagrees with the State's position that people with certain convictions cannot be trusted. *See* ECF 93-11, Darlington Dep, 250:8-23. LWVFL refuses to inquire about potential volunteers' convictions or conduct registration drives in any way that suggests someone is less trustworthy simply because of their criminal record. ECF 93-1, Scoon Decl., ¶¶13, 28. Requiring LWVFL to convey the government's message of distrust would directly alter its message of inclusion. *See VoteAmerica v. Raffensberger*, 609 F. Supp. 3d 1341, 1360 (N.D. Ga. 2022).

## 2. *LWVFL has diverted resources and will continue to do so*

Civic organizations that must expend time and resources to address state laws have standing. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341-42 (11th Cir. 2014). For example, the reasonable anticipation of diverting time and personnel from an organization's regular activities to educate volunteers on compliance with new requirements confers standing. *Com. Cause/Georgia v. Billups*, 554 F.3d 1340, 1350-51 (11th Cir. 2009).

The Restriction has forced LWVFL to divert considerable time, personnel, and resources away from its normal activities toward understanding and complying with the law. First, LWVFL leaders spent hours researching and reviewing the impact of the Restriction and preparing new exams and study materials for voter-registration volunteers, including to determine how to make the transition to online registration. ECF 93-13, Email re Online Training; ECF 93-1, Scoon Decl., ¶30 ECF 93-2, Chandler Decl., ¶13; ECF 93-14, LWVFL Voter Registration Quiz. LWVFL held at least four different training sessions for members, and a portion of each focused on the Restriction. ECF 93-2, Chandler Decl., ¶13. This time has been diverted away from LWVFL

leaders' responsibilities coordinating the efforts between local League chapters to streamline LWVFL's voter registration, education, and engagement programs and away from members' time registering voters. ECF 93-2, Chandler Decl., ¶13.

Second, LWVFL's Co-Presidents spent significant time conferring with the Board of Directors about how to respond to the Restriction, including whether to switch to online registration. ECF 93-12, Williams Decl., ¶3. This diverted the Board's time away from overseeing the League's operations, budget, and financing. ECF 93-2, Chandler Decl., ¶14. It also diverted time and resources from hiring: one Board position (the treasurer) was unfilled for approximately 90 days because League leaders focused on responding to the Restriction. *Id.* ¶16.

Third, LWVFL plans to spend approximately $26,000 on iPads, $11,600 on 58 Wi-Fi hotspots (two per local chapter), and $20-40 per month per hotspot. *Id.* ¶12; ECF 93-1, Scoon Decl., ¶33; ECF 93-7, July Emails with T-Mobile. This money will be diverted from several other projects, including LWVFL Co-Presidents' travel to meet with local League presidents, as well as creating and distributing table signs, banners, and flyers for voter registration events. ECF 93-2, Chandler

14

Decl., ¶12. This is not a "self-imposed harm," as the State has argued. Mem. at 10. As explained in Part I.A.1., *supra*, the League cannot comply with the Restriction without damaging its relationship with its own members and its community. "When a drain on an organization's resources arises from the organization's need to counteract the defendants' assertedly illegal practices, that drain is simply another manifestation of the injury to the organization's noneconomic goals." *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008) (quotation marks omitted).

Even if LWVFL resumed its regular voter-registration drives, the Restriction would require diversion of resources. LWVFL would either have to pay to conduct background checks on all volunteers or spend time verifying volunteers' own reports of their criminal histories. ECF 93-2, Chandler Decl., ¶¶17-18. Even if LWVFL could avoid liability with the Non-Felon Declaration,[7] it would require dozens of hours of staff and

---

[7] As explained in n. 5, *supra,* the Declaration will not allow the League to avoid liability.

member time to ensure that each existing and new League volunteer understands and signs the Declaration. *Id.* ¶17.

The Restriction has also caused the League of Women Voters of Florida, Inc., LWVFL's § 501(c)(4) affiliate, to "divert [its] energies to advocacy activities" related to the Restriction rather than on its normal work, such as advocacy for reproductive rights, education, and gun safety. *Fort Lauderdale Food Not Bombs*, 11 F.4th at 1287. ECF 93-1, Scoon Decl., ¶30. For example, LWVFL Co-President Cecile Scoon commented to multiple media outlets and testified to the Florida legislature when her time spent on (c)(4) activity would have normally been devoted to overseeing LWVFL and the other priority advocacy issues listed above. ECF 93-1, Scoon Decl., ¶30; ECF 93-15, Orlando Sentinel and Tallahassee Democrat Articles; ECF 93-18, LWVFL BOD Meeting.

B. <u>LWVFL has associational standing</u>

LWVFL has associational standing because (1) its members would have standing to sue on their own; (2) the interests at stake are related to LWVFL's purpose; and (3) the participation of individual members is not required. *See Dream Defenders v. Governor*, 57 F.4th 879, 886 (11th

Cir. 2023). Here, hundreds of LWVFL's members are injured because the Restriction prevents them from associating with volunteers or other members with covered felony convictions.

Many members would have standing to sue on their own. That includes (1) members with felony convictions and (2) those without convictions, but who are unable to freely associate with other LWVFL members or volunteers because of the Restriction. *See Browning*, 522 F.3d at 1160 ("When the alleged harm is prospective, we have not required that the organizational plaintiffs name names because every member faces a probability of harm in the near and definite future.").

LWVFL's leadership knows of several people with past felony convictions who perform voter registration services with LWVFL. *See* ECF 93-2, Chandler Decl., ¶20; ECF 93-1, Scoon Decl., ¶11; ECF 93-12, Williams Decl., ¶4. There are likely other members with past felony convictions, but LWVFL does not inquire about the criminal history of its members. Similarly, if LWVFL leaders learn that a member has been convicted of a felony, they do not ask about the nature of the crime, which is why LWVFL has not identified specific members with convictions that would be covered by the Restriction. ECF 93-2, Chandler Decl., ¶11.

Members without felony convictions have likewise been harmed and will continue to suffer harm. First, they have been unable to participate in paper voter-registration drives because of the Restriction. Second, even if paper drives resume, those members will be able to associate with fewer volunteers and participate in fewer drives, because working with people with disqualifying felonies would lead to a $50,000 fine. ECF 93-1, Scoon Decl., ¶¶ 12, 29; ECF 93-12, Wiliams Decl., ¶21.

LWVFL members will also be unable to collaborate on drives with formerly incarcerated people or organizations whose volunteers might have disqualifying convictions. LWVFL Co-President Cecile Scoon knows of people with past felony convictions who have collected or handled voter registration forms at events in collaboration with LWVFL. ECF 93-1, Scoon Decl., ¶¶11-12. These people want to assist LWVFL with voter registration during the 2024 election cycle, but LWVFL has had to refuse their assistance because of the Restriction. *Id.*

The second and third prongs of the associational standing test are easily met. The interests at stake are unquestionably "germane to the organization's purpose," and participation of individual members is not required to achieve the relief sought here. *Arcia*, 772 F.3d at 1342.

C. <u>The other standing requirements are satisfied</u>

The Restriction's harms are traceable to the Secretary, and the injuries to LWVFL and its members will be redressed by a favorable decision. The Secretary enforces and administers the Restriction, *see* Fla. Stat. §§ 97.0575(8), 97.012(1)-(2), and a decision enjoining the Restriction would remedy the injuries to the League and its members. *See Fla. NAACP*, 2023 WL 4311084, at *8-*9.

*     *     *

If there are "genuine issue[s] of material fact as to whether the Plaintiffs have standing," summary judgment should be denied. *Fort Lauderdale Food Not Bombs*, 11 F.4th at 1286. The League has proffered evidence that the Restriction has led it to register fewer voters and curtail its First Amendment activity because of the move to online registration. It has also shown that the Restriction would lead it to register fewer voters even if it resumed paper registration drives, and that it has expended time and money to respond to the Restriction. Moreover, the League's members, including those with felony convictions and those without, have been unable to freely speak and associate, and unable to

register as many voters, because of the Restriction. The Secretary has not credibly refuted these facts, nor could he at the summary judgment stage.

## II. Summary Judgment Is Inappropriate on LWVFL's Freedom of Speech and Association Claims

A. <u>The record supports the conclusion that strict scrutiny applies and that the law cannot satisfy any level of scrutiny</u>

1. *The First Amendment protects LWVFL's voter registration activity*

Courts have consistently held that the First Amendment protects the speech, expressive conduct, and association inherent in helping people register to vote. *See, e.g.*, *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 722 (M.D. Tenn. 2019); *League of Women Voters of Fla. v. Browning,* 863 F. Supp. 2d 1155, 1158 (N.D. Fla. 2012); *Cobb*, 447 F. Supp. 2d at 1331-34. Laws curtailing voter-registration activity substantially proscribe communication with potential voters about political issues, leading to "'speech diminution.'" *Hargett*, 400 F. Supp. 3d at 723 (quoting *Meyer v. Grant*, 486 U.S. 414, 421 (1988)); *see also Cobb*, 447 F. Supp. 2d at 1332 (analogizing 3PVRO requirements to those in *Meyer*, which "reduced speech").

LWVFL's voter-registration activity involves conduct as well as speech, but "[c]onstitutional protection for freedom of speech does not end at the spoken or written word." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) (quotation marks omitted). LWVFL's registration drives are expressive because they clearly demonstrate "an intent to convey to convey a particularized message," and there is no question that "some sort of message" would be understood by those who viewed it. *Id.* (quotation marks omitted).

During a typical drive, volunteers often approach people by asking if they are registered to vote; if not, they encourage registration. Volunteers talk about the importance of voting and may bring up issues that are important in an upcoming election. ECF 93-1, Scoon Decl., ¶¶14, 20-21; ECF 93-2, Chandler Decl., ¶25. During that conversation, someone may complete a voter-registration form and give it to a volunteer. ECF 93-1, Scoon Decl., ¶21; ECF 93-2, Chandler Decl.,¶25. This shows that potential voters interpret LWVFL's activity as conveying a pro-registration message and that LWVFL's speech is inextricably intertwined with its conduct at registration drives.

The Secretary seeks to "divorce" speech encouraging registration from the collecting of voter-registration forms, Mem. at 13-14, but "the First Amendment does not countenance slicing and dicing [a] plaintiff's actions." *VoteAmerica v. Schwab*, 2023 WL 3251009 at *13 (D. Kan. May 4, 2023); *accord Hargett*, 400 F. Supp. 3d at 721.[8] That is because "participation in voter registration implicates a number of both expressive and associational rights which are protected by the First Amendment" that "may be invoked by . . . third parties who encourage participation in the political process."[9] *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 700 (N.D. Ohio 2006).

---

[8] Defendant's reliance on *League of Women Voters of Fla. v. Browning*, 575 F. Supp. 2d 1298, 1322 (S.D. Fla. 2008), misses the mark. *See* Mem. at 14. There, the court considered a deadline for organizations to turn in applications after they were collected, not a law affecting the very interaction in which volunteers encourage people to vote.

[9] The Secretary's arguments concerning *Meyer,* 486 U.S. at 414, and *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999) create a distinction without a difference. *See* Mem. at 15-16. The Secretary makes no genuine attempt to distinguish between collecting signatures for a petition and collecting voter-registration applications, nor could he. *See Hargett*, 400 F. Supp. 3d at 724. And notably, the Secretary fails to acknowledge that the law at issue in *Buckley* also limited *who* could collect petition signatures (only registered voters), just like the Restriction limits *who* can collect voter registration applications. *See* 525 U.S. at 186.

In other words, the fact that the Restriction does not directly prohibit LWVFL volunteers from discussing voter registration is immaterial. *See* Mem. at 13-16. The Supreme Court has held that the availability of "other means to disseminate [a plaintiff's] ideas" does not diminish First Amendment protection for that person's chosen means of communication. *Meyer*, 486 U.S. at 424. Nor do "more burdensome avenues of communication" relieve the Restriction's "burden on First Amendment expression." *Id.* (quotation marks and citation omitted).

Even if the Restriction allows for some speech, it will still lead to "speech diminution" and prevent LWVFL from both employing its chosen means of expression and fully associating with certain volunteers. *Hargett*, 400 F. Supp. 3d at 723. For example, if disqualified volunteers were allowed to work at registration events without touching applications, LWVFL would still have to investigate each of its volunteers statewide to learn their felony conviction status, and it would still need to re-train each one on how to work at events without violating the law. *See* ECF 93-2, Chandler Decl., ¶¶17-18. It would then be required to identify disqualified volunteers at each drive, and somehow ensure that an eligible volunteer was in the vicinity each time a

disqualified volunteer approached a potential applicant. If an applicant attempted to hand the application to a disqualified volunteer, the volunteer would be forced to refuse it and find another person to collect the application.

## 2. *The Court should apply strict or exacting scrutiny*

Because LWVFL's voter registration activity involves "core political speech," as well as related expressive conduct and associational activity, this Court must apply "exacting" scrutiny applied in *Meyer*, 486 U.S. 414, and *Buckley*, 525 U.S. 182.

Courts have held the intertwined speech and conduct LWVFL volunteers engage in must be protected by the "well-nigh insurmountable" standard set by *Meyer* and *Buckley*. 486 U.S. at 425; *see Hargett*, 400 F. Supp. 3d at 703; *see also Schwab*, 2023 WL 3251009 at *14; *Priorities USA v. Nessel*, 462 F. Supp. 3d 792, 812 (E.D. Mich. 2020).

The Restriction is directly analogous to the laws invalidated in *Meyer* and *Buckley*. In *Buckley*, the law required that initiative petition circulators be registered voters. *See* 525 U.S. at 193. And in *Meyer*, the law prohibited paying people to work as petition circulators. *See* 486 U.S. at 416. Just as here, both laws "limi[ted] the number of voices who

[would] convey the initiative proponents' message and, consequently, cut down the size of the audience proponents [could] reach." *Buckley*, 525 U.S. at 194-95 (quotation marks omitted).

Separately, the Restriction must be reviewed under strict scrutiny because it is content- and viewpoint-based. *See Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018). The law is content-based since it applies "because of the topic discussed"—voter registration. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). And it is viewpoint-based because it "prohibit[s] only one perspective"—encouragement of voter registration. *Speech First,* 32 F.4th at 1127.

The Secretary's confounding hypothetical about "a nefarious 3PVRO" provides no help. Mem. at 16. Even if the Restriction applied "to groups that wish to *discourage* voter participation," *id.*, the Restriction would still be content-based, because it undisputedly targets the topic of voter registration. *See Reed*, 576 U.S. at 163. Moreover, that 3PVRO would *still* be engaging in pro-registration speech to voters, even if its speech were disingenuous. The Restriction targets real 3PVROs that promote voter registration; the imagined existence of a covert anti-

registration operation cannot change the fact that the law limits only the activities of those who promote voter registration.

The *Meyer-Buckley* standard also applies to LWVFL's freedom of association claims. Voter-registration groups "act collectively with others, implicating the First Amendment right of association." *Browning*, 863 F. Supp. 2d at 1158. But the Restriction prevents LWVFL from freely associating with any volunteer or potential member excluded by the law. *See NAACP v. Button*, 371 U.S. 415, 430, 437 (1963); *see also Dale*, 530 U.S. 640 (2000) (recognizing right of associations to choose their members). The Restriction would also compel LWVFL to ask each member about their criminal history, violating LWVFL policy and deterring Floridians from joining or remaining in the League. Because it creates those burdens, the Restriction "must be narrowly tailored to serve a compelling interest." *Buckley*, 525 U.S. at 206 (Thomas, J., concurring in the judgment).

### 3. *The Restriction cannot survive any heightened scrutiny*

The Restriction must be invalidated because the Secretary is unable to show that it is narrowly tailored to serve a compelling interest.

The Secretary has put forth a litany of state interests that the Restriction purportedly serves, including: promoting fairness, honesty, order, public confidence, and election integrity, while avoiding voter confusion, deception, frustration of the democratic process, and fraud. Mem. at 18. Separately, the Secretary has relied on a different list of state interests, which also includes "ensuring voter registration applications are timely processed." Darlington Decl., ECF 38-1 at App. 0093; Darlington Decl., ECF 86-7 at 3.

Defendant has not addressed how the Restriction serves most of the interests listed above. For example, it remains unexplained how the law maintains fairness and public confidence or avoids confusion.[10]

The Secretary contends that the law is narrowly tailored because "in 2022 alone, thousands of eligible Florida voters had their voter-registration applications untimely submitted by 3PVROs." Mem. at 18. Conspicuously absent is any evidence, or even a direct assertion, that

---

[10] Likewise, and unsurprisingly, although the Restriction has been enforceable for months, neither the Secretary nor Attorney General has been able to point to any improvement in 3PVRO timeliness or any reduction in misconduct. *See*, *e.g.*, ECF 93-16, Cox Dep., 62:10-65:22.

volunteers convicted of the disqualifying felonies were more likely to turn in late applications.

The Secretary also asserts that "Florida voters were the victims of criminal activity caused by 3PVRO felon canvassers" and emphasizes that the Restriction affects only a subset of people with convictions. Mem. at 18. But the Secretary does not even allege that the Restriction would have excluded the "felon canvassers" he relies upon so heavily. While he has previously asserted that one or more "felon canvassers" would have been disqualified, he has failed to provide any evidence supporting that assertion. *See, e.g.*, ECF 93-11, Darlington Dep., 237:15-43:1 (asserting that Roderica Cody would be covered by the Restriction but failing to identify any qualifying conviction in her record); ECF 93-17, Roderica Cody Court Records (listing Roderica Cody's underlying convictions as battery and petit theft). Similarly, the Attorney General is unaware of any prosecutions of 3PVRO workers with a disqualifying felony and has been unable to name any person who committed a disqualifying felony and then engaged in registration-related misconduct. ECF 93-16, Cox Dep., 68:9-22, 73:9-73:25. It is insufficient for the Secretary to make general, unsupported assertions that people convicted of felonies are

likely to commit misconduct in the future. *See Johnson v. City of Cincinnati*, 310 F.3d 484, 503, 506 (6th Cir. 2002).

Even if the Secretary could point to a few people who had committed registration-related misconduct after being convicted of a disqualifying felony, he would be unable to show that the law is well-tailored. First, the Restriction covers hundreds of crimes, such as unlawfully subleasing a car and charging over fifty dollars for a debt-management consultation. Fla. Stat. §§ 817.5621; 817.802(1).[11] As the Secretary's representative Andrew Darlington testified, "there's a kind of wide variety of crimes in [Chapter 817]," further demonstrating the lack of narrow tailoring. ECF 93-11, Darlington Dep., 257:16-17. It also disqualifies people who have had their rights restored, those who were convicted decades ago, and perhaps even people who have been pardoned.[12] The Secretary has

---

[11] The Secretary could not explain why the Restriction would cover a conviction under 817.802(1), instead incorrectly denying that a violation of that law constituted a felony. *See* ECF 93-11, Darlington Dep., 254-57; Fla. Stat. § 817.806(2).

[12] While the Secretary initially asserted that people who were pardoned would still be disqualified under the Restriction, ECF 38 at 21, Mr. Darlington later testified that a person who was pardoned would no longer be disqualified. ECF 93-11, Darlington Dep., 268-69.

offered no evidence or explanation for the need to restrict the First Amendment rights of such a broad category of people.

The Restriction's wide range of covered activity, much of which cannot be tied to the State's interests, further demonstrates its poor tailoring. It prevents all "collecting and handling" of voter registration forms, even if a disqualified volunteer is in public and supervised. And while the scope of the term "collecting and handling" is unclear, the Secretary has represented that it might even prevent a volunteer from being in the *same room* as completed applications. ECF 93-11, Darlington Dep., 205:5-06:25 (discussing § 97.0575(1)(f)), 262:6-63:18, or from simply picking up a stack of completed applications to drop them in a mailbox. *Id.* 263:11-64:9. There can be no real dispute that there are "other, reasonable ways to achieve [the state's] goals with a lesser burden on constitutionally protected activity." *Dunn v. Blumstein*, 405 U.S. 330, 343 (1972).

Finally, the Restriction's draconian penalty does not fit well with the State's interests. Only 3PVROs must pay the $50,000 fines, not volunteers, and they must do so on a strict-liability basis, regardless of any good-faith efforts to prevent qualified volunteers from collecting or

handling applications.[13] *See Am. Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 612-13 (6th Cir. 2005) (invalidating parade ordinance with "strict liability regime").

The *Anderson-Burdick* standard does not apply here, but even if it did, the result would be the same. Regulations on core political speech create a severe burden, leading to heightened scrutiny under *Anderson-Burdick*. *See Curling v. Raffensperger*, 50 F.4th 1114, 1122 (11th Cir. 2022). Weighing that burden "against the precise interests put forward by the State" demonstrates that the Restriction cannot survive, for the reasons explained above. *Id.* at 1121 (quotation marks omitted).

B. Summary judgment is premature because material facts remain in dispute

Although LWVFL has shown that the Restriction should likely be invalidated, multiple issues of material fact remain in dispute. First, LWVFL has presented evidence as to how its voter registration drives operate, supporting its argument that the Restriction imposes a severe

---

[13] As explained in n.5, *supra*, the Secretary is wrong to assert that the League can avoid liability by asking all of its members to sign a Non-Felon Declaration.

burden on its speech, expressive conduct, and ability to associate. ECF 93-1, Scoon Decl., ¶34; ECF 93-2, Chandler Decl., ¶27. "The size of that burden is a question of fact" that must be weighed at trial. *League of Women Voters of Fla., Inc. v. Lee*, 576 F. Supp. 3d 1004, 1012 (N.D. Fla. 2021).

Moreover, the parties dispute whether the Restriction serves the State's interests. For instance, there remains a factual dispute about whether people disqualified by the Restriction are less likely to timely submit voter-registration applications. Thus, "the extent to which Florida's legitimate interests require that it impose the burden" is also a question of fact for trial. *Id.* Likewise, the Secretary has alleged that "felon canvassers" have harmed voters, Mem. at 18, but several factual questions remain about those allegations, including whether the Secretary can name a single person who would have been disqualified by the Restriction who has later committed voter-registration misconduct. Further, the Secretary has "not demonstrated that the combination of strict liability[ and] heavy fines . . . is necessary to ensure that third party organizations do not strip Florida citizens of their right to vote." *Cobb*, 447 F. Supp. 2d at 1337.

## III. The Secretary Is Not Entitled to Summary Judgment on LWVFL's Vagueness Claim

"It is . . . a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1349 (11th Cir. 2021) (quotation marks omitted). "[W]hen speech is involved, 'rigorous adherence' to the twin concerns of fair notice of what's prohibited and precise guidance to prevent arbitrary or discriminatory enforcement 'is necessary to ensure that ambiguity does not chill protected speech.'" *League of Women Voters of Fla., Inc. v. Lee*, 595 F. Supp. 3d 1042, 1131 (N.D. Fla. 2022) (quoting *Wollschlaeger*, 848 F.3d at 1320), *aff'd in part, vacated in part, rev'd in part sub nom. League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905 (11th Cir. 2023).

The Secretary analyzes the League's vagueness challenge under the wrong standard. The Secretary relies on the standard articulated in *SisterSong Women of Color Reprod. Just. Collective v. Governor of Ga.*, 40 F.4th 1320, 1327 (11th Cir. 2022). *See* Mem. at 24. But as the Eleventh Circuit later confirmed in *Dream Defenders*, 57 F.4th 879, "[t]he First Amendment context amplifies [] concerns [about arbitrary and

discriminatory enforcement] because an unconstitutionally vague law can chill expressive conduct by causing citizens to steer far wider of the unlawful zone to avoid the law's unclear boundaries." 57 F.4th at 890 (quotation marks and citation omitted).

A. <u>The Restriction is vague because it fails to define which felonies are covered</u>

The Restriction fails to specify who exactly it covers, creating a significant risk of arbitrary enforcement. First, the Secretary has contradicted himself and statutory text when attempting to clarify whether people with federal or out-of-state convictions are covered. While the statute only lists Florida crimes, the Secretary announced in his preliminary injunction brief that he "read[] the statutory prohibition to apply to any person who has been convicted of any similar felony offense committed in another jurisdiction." ECF 38 at 22, n.7. But months later, Defendant's representative Andrew Darlington testified that the Restriction did *not* apply to non-Florida convictions before changing positions to reflect the Secretary's prior interpretation. *See* ECF 93-11, Darlington Dep., 269:11-270:1, 273:7-275:22. This has created significant confusion for LWVFL. *See* ECF 93-12, Williams Decl., ¶18.

The Secretary's "Non-Felon Declaration" further highlights the ongoing confusion. Like the statute itself, the Declaration makes no mention of out-of-state or federal convictions. But Mr. Darlington testified that if a volunteer with a previous "comparable" non-Florida offense signed the Declaration and collected or handled voter-registration applications, the 3PVRO could be fined $50,000. *See* ECF 93-11, Darlington Dep., 272:4-275:22. The possibility of the State levying a fine in such a situation only reemphasizes how the Restriction and its vagueness places 3PVROs in a precarious situation.

Moreover, if the Restriction applies to non-Florida convictions, neither the Restriction nor the Secretary's rulemaking provides *any* guidance as to what crimes are comparable to those in the statute. *See, e.g.*, ECF 93-16, Cox Dep., 87:22-88:2 (Attorney General unaware of any guidance on which out-of-state felonies would be covered). This lack of clarity creates an intolerable risk of arbitrary and discriminatory enforcement—precisely the dangers the void-for-vagueness doctrine seeks to avert.

Further, the Restriction's statutory text makes no mention of individuals with felony convictions who later receive pardons. Defendant

first claimed that those receiving pardons remained disqualified by the Restriction, ECF 38 at 21, but later said that the Restriction does *not* apply to such individuals. *See* ECF 93-11, Darlington Dep., 268:13-269:10.

The Secretary makes no genuine effort to clarify the statute's scope. He simply argues that the Restriction has an "understandable core" because it lists specific felony offenses and does not include any "vague offenses." Mem. at 24. The Secretary also argues that the Restriction's silence on federal and out-of-state convictions is not relevant to a facial challenge to the law. *Id.* at 27. But as explained above, the Secretary's applies the wrong legal standard; his failure to grapple with the potentially large class of people with non-Florida convictions whose status is unclear, or those who have been pardoned, leads only to the conclusion that the Restriction is unconstitutionally vague.

B. <u>The Restriction is vague because the term "collecting and handling" fails to clearly define what activities are prohibited</u>

The Restriction is also unconstitutionally vague because it does not clarify what "collecting and handling" means. It remains unclear whether otherwise disqualified volunteers may supervise volunteers who

physically collect forms, distribute blank registration forms, or drive a car with completed registration forms, for instance. While the Secretary has attempted to answer some of those questions, his manufactured definition has little basis in the statutory text.

Defendant argues that the words "collect" and "handle" refer to activities that involve "physical custody" of voter-registration forms. Mem. at 24-26. Specifically, he argues that "collect" is commonly understood to mean "to gather" "from a number of persons" and that "handle" means "to manage with the hands." *Id.* at 25.[14] But the words "physical custody" appear nowhere in the Restriction, and there is no good reason to import that definition onto the terms "collect" and "handle." For example, Merriam-Webster defines "handle" as "to act on or perform a required function with regard to."[15] Thus, unsurprisingly, the Attorney General does not endorse the same definition as the

---

[14] The Secretary's reference to rulemaking that purports to clarify the meaning of the terms "collect" and "handle" is unavailing, *see* Mem. at 26, as the relevant inquiry is whether the statutory language standing alone can be understood by a person of ordinary intelligence. *See Fla.* NAACP, 2023 WL 4311084, at *20.

[15] Handle Definition & Meaning - Merriam-Webster. https://www.merriam-webster.com/dictionary/handle .

Secretary and has represented that even assistance with an online application would constitute "collecting and handling." *See* ECF 93-16, Cox Dep., 81:10-20, 133:7-140:24, 213:1-214:4.[16]

Indeed, even the dictionary definitions the Secretary cites do not align with the activity covered by the Restriction. As to "handling," Defendant has argued that such physical custody includes "a 3PVRO volunteer with a stack full of completed applications in his car." ECF 38 at 20. Yet, a volunteer driving with completed applications need not have managed applications with their hands, especially if other volunteers participated in a voter-registration drive. Coverage of that activity depends on the additional "physical custody" requirement manufactured by Defendant.[17]

_____

[16] While part of Mr. Cox's testimony addressed the Non-U.S. Citizen Volunteer Restriction in Fla. Stat. § 97.0575(1)(f), that provision is identical to the Felony Volunteer Restriction in all respects except for who it disqualifies, and the State has defined the term "collecting or handling" the same way for each provision. *See* Fla. Admin. Code 1S-2.042(3)(c).

[17] Further, Defendant relies on the Restriction's "context" to argue that the word "handle" does not mean "to have overall responsibility for supervising or directing," arguing that the Restriction concerns only the

Likewise, Defendant claims that the Restriction does not apply to *blank* voter registration forms. Mem. at 26. That limitation appears nowhere in the statute—the Secretary simply asks this Court to read in a limitation that is not there. Of course, a reasonable person would believe that a volunteer who is handing out blank forms was "handling" those forms.

C. <u>Summary judgment is inappropriate because the record is incomplete</u>

This Court has not yet decided the extent to which the Restriction implicates the First Amendment—and in turn, the heightened standard articulated in *Dream Defenders*. Thus, because genuine issues of material fact remain, including the extent to which the Restriction implicates Plaintiffs' First Amendment rights, the Secretary is not entitled to summary judgment.

Just like the plaintiffs in *Lee*, 576 F. Supp. 3d at 1012, Plaintiffs here have "come forward with evidence suggesting that the challenged

_____

"collecting or handling" of *forms*, not *persons*. Mem. at 26. But this argument ignores that forms, too, can be the object of supervision or direction.

provision[] impose[s] at least some burdens" on their First Amendment rights. Thus, just as in *Lee*, "the size of that burden is a question of fact," precluding summary judgment. *Id.*; *accord id.* at 1015 ("[T]his Court will not resolve Plaintiffs' vagueness claims at this juncture" because "whether Plaintiffs' conduct implicates the First Amendment impacts this Court's analysis of these claims as well.").

## IV. Summary Judgment Is Not Warranted on LWVFL's Overbreadth Claim

"Vagueness and overbreadth are interrelated but discrete concepts." *Lee*, 595 F. Supp. 3d at 1127 (citation omitted). "[T]he overbreadth doctrine loosens the rules typically governing facial attacks on the constitutionality of a statute," *id.* at 1137 (citation omitted), "because the threat of enforcement of an overbroad law may deter or chill constitutionally protected speech," *id.* (quotation marks omitted). A court "must ask whether [the challenged law] prohibits a substantial amount of activity protected by the First Amendment relative to the amount of unprotected activity it prohibits." *Id.*

The Restriction is overbroad because it reaches far beyond any reasonable scope of the State's interest in ensuring competent and honest

performance of voter-registration assistance.[18] It prevents all covered volunteers from performing prohibited activities, even if they are supervised by other experienced voter-registration agents, covering far more speech than needed. And even if the State had some interest in forbidding certain people with felony convictions from assisting with voter registration, the scope of covered volunteers is unconstitutionally broad. The Restriction applies to potential volunteers who have been convicted of crimes that provide no indication they are likely to commit fraud or otherwise dishonestly register voters on behalf of the League, as well as to people with decades-old convictions and those whose rights have been restored. *See* Part II.A.3. and n.11-12, *supra* (discussing specific felonies covered).

---

[18] The Restriction's strict-liability regime exacerbates this problem. *See Dream Defenders*, 57 F.4th at 892 (noting that determining the law's *mens rea* requirement was necessary as part of overbreadth analysis). Because there is no requirement that 3PVROs know or should know that a volunteer is disqualified, the Restriction fails to properly target the activities it purports to prohibit and will discourage voter-registration activity that the Restriction allows. *See id.*; *United States v. Kelly*, 625 F.3d 516, 522 (8th Cir. 2010) (invalidating special-release condition on overbreadth grounds, noting that its "sweeping reach" was "magnified by its strict-liability phrasing").

Defendant asserts that the Restriction prevents "fraud and other crimes" that individuals with certain felony convictions have allegedly perpetrated "when registering Floridians to vote." Mem. at 2. But Defendant relies on one anecdote about a single 3PVRO and nonspecific data about "a number of criminal referrals related to 3PVROs," *see* Mem. at 4-5, to defend the Restriction. Such sparse evidence is inadequate to justify the Restriction's broad sweep and to entitle the Secretary to summary judgment.

Even assuming that the Restriction is "reasonably necessary" to advance a legitimate governmental interest, genuine issues of material fact remain as to whether the Restriction goes too far. As noted, the Restriction covers a wide swath of felony convictions and includes crimes that have no connection to voter fraud or election-related crimes. The speculation that Defendant offers—that "if you don't respect bodily integrity and life, you probably won't respect someone else's driver's license number or identification card number,"—fails to address large categories of crimes and is cannot be accepted as fact for summary-judgment purposes. Mem. at 23.

Likewise, the Restriction's statutory language makes no mention of people with felony convictions who have received pardons or had their civil and voting rights restored. And the Secretary makes representations in his moving papers—*i.e.*, that the Restriction applies to "decades-old convictions and those whose rights have been restored"—that contradict his representative's deposition testimony. *See* ECF 93-11*, Darlington Dep., 268:13-269:10. Setting this contradiction aside, Defendant's justification here—that such individuals may "still disrespect the Election Code, take advantage of vulnerable populations, and have veracity issues"—is untethered from any evidence.

## CONCLUSION

The Secretary's motion should be denied.

Dated: February 8, 2024

Respectfully submitted,

/s/ Brent Ferguson

Chad W. Dunn
Florida Bar No. 0119137
1200 Brickell Avenue, Suite 1950
Miami, FL 33131
Telephone: (305) 783-2190
Facsimile: (305) 783-2268
chad@brazilanddunn.com

Brent Ferguson (D.C. Bar No. 1782289)*
Danielle Lang (D.C. Bar No. 1500218)*
Jonathan Diaz (D.C. Bar No. 1613558)*
Molly E. Danahy (D.C. Bar No. 1643411)*
Christopher Lapinig (Cal. Bar No. 322141)*
Ellen Boettcher (D.C. Bar No. 90005525)*
Alexandra Copper (Cal. Bar No. 335528)*
Michael Ortega (IL Bar No. 6339469)*
Simone Leeper (D.C. Bar No. 1737977)*
1101 14th Street NW, Ste. 400
Washington, DC 20005
(202) 736-2200
bferguson@campaignlegal.org
dlang@campaignlegal.org
jdiaz@campaignlegal.org
mdanahy@campaignlegal.org
clapinig@campaignlegal.org
eboettcher@campaignlegal.org
acopper@campaignlegal.org
mortega@campaignlegal.org
sleeper@campaignlegal.org

*Counsel for Plaintiffs*

*Admitted Pro Hac Vice*

## CERTIFICATE OF COMPLIANCE

I certify that the summary-judgment memorandum is 7,975 words, which is under the 8,000-word limit in Local Rule 56.1(C). I also certify that this document complies with the typeface and formatting requirements in Local Rule 5.1

/s/ Brent Ferguson
Brent Ferguson


## CERTIFICATE OF SERVICE

I certify that on February 8, 2024, this document was uploaded to CM/ECF, which sends the document to all counsel of record.

/s/ Brent Ferguson
Brent Ferguson